UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9/30/18_

MINDSPIRIT, LLC; MALVIKA
KUMAR; and ROSEWOOD PARTNERS,

               Plaintiffs,

      - against -

EVALUESERVE LTD.,

               Defendant.

**MEMORANDUM
OPINION & ORDER**

15 Civ. 6065 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

In this action, Mindspirit, LLC, and its two members -- Malvika Kumar and

Rosewood Partners -- allege that Defendant Evalueserve Ltd. breached an agreement to issue

480,000 Evalueserve stock options to Mindspirit. According to Plaintiffs, although Evalueserve

issued these options to Mindspirit in April 2001, it later breached the parties' agreement by

wrongfully re-issuing these stock options in the names of Rajat Gupta and Anil Kumar, non-

parties to this action. (See Am. Cmplt. (Dkt. No. 19) ¶¶ 20, 49, 61, 64-70, 109-113)

As a result of this Court's ruling on Evalueserve's motion to dismiss, Mindspirit

is the sole remaining plaintiff, and only Mindspirit's breach of contract and unjust enrichment

claims remain. (See id.; Sept. 26, 2016 Order (Dkt. No. 45))

Evalueserve has moved for summary judgment on Mindspirit's remaining claims,

arguing that (1) they are barred by the applicable statute of limitations; (2) the parties' contract

bars the unjust enrichment claim; (3) there was no breach of contract; (4) the doctrine of

illegality bars the breach of contract claim; (5) the parties' mutual mistake either (a) excuses any

further performance by Evalueserve or (b) is grounds for reformation of the contract; and (6)

there has been no unjust enrichment to Evalueserve, because (a) Evalueserve provided the value

at issue to third-parties and did not retain that value, and (b) equity and good conscience do not require restitution. (Def. Mot. (Dkt. No. 78)) Mindspirit has cross-moved for summary judgment on Evalueserve's statute of limitations and illegality defenses. (Pltf. Mot. (Dkt. No. 73))

For the reasons stated below, Evalueserve's motion for summary judgment will be granted as to the unjust enrichment claim, but will otherwise be denied. Mindspirit's cross-motion for partial summary judgment will be granted as to Evalueserve's illegality defense, but will otherwise be denied.

## BACKGROUND

I.   **FACTS**[1]

    A.   **The Parties**

Plaintiff Mindspirit is a Nevada limited liability company, formed on January 26, 2001, with two members: Malvika Kumar – the wife of Anil Kumar ("Kumar") – and Rosewood Partners. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 1-5) Since Mindspirit's formation, Rosewood has held 75% of the membership interest in Mindspirit, and Malvika Kumar has held the remaining 25%. (Id. ¶¶ 3-4)

---

[1] To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted). Where the non-moving party disputes the moving party's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-moving party's characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion). Unless otherwise indicated, the facts cited by the Court are undisputed.

Rosewood is an Illinois partnership.  (Deuser Aff. (Dkt. No. 40) ¶ 6)  Between 2001 and 2013, Rajat Gupta ("Gupta") was one of Rosewood's general partners.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 7)  According to Rajat Gupta, Rosewood is "a family partnership for [his] kids."  (Gupta Dep. (Dkt. No. 88-92) at 99[2]; see also id. at 16 (Gupta referring to Rosewood as "my family investment company"))  Rosewood presently has five partners:  the Anita Gupta 2013 Irrevocable Trust, Geetanjali Gupta, Deepali Gupta, Megha Gupta, and Aditi Gupta.  (Deuser Aff. (Dkt. No. 40) ¶ 8)

Kumar and Gupta formed Mindspirit, using Shivbir Grewal, an attorney selected by Kumar, to perform the necessary legal work.  (See Kumar Dep. (Dkt. No. 88-90) at 28-29 ("[I]n late 2000-early 2001, Gupta and I had discussed the fact that we were making so many investments that it was actually for the benefit of our families that we set up an organization where those investments would be held, from an estate planning perspective, and we thought we would set one up called Mindspirit from which the investments would be made. . . . We retained a law firm in L.A. to . . . do the paperwork, and that's what they did."))  When Mindspirit was formed, Kumar told Grewal that Gupta would be the manager of and signatory for Mindspirit.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 59)

Mindspirit's principal place of business is 59 Beachside Avenue in Stamford, Connecticut (id. ¶ 1), which is one of Gupta's residences.  (Gupta Dep. (Dkt. No. 88-92) at 4)  Until 2007, Mindspirit's mailing address was Gupta's business office in Stamford, where Mindspirit's business records were maintained.  (Id. at 12, 23)  Mindspirit's accounting and tax

---

[2] Except as to deposition transcripts, all citations in this Opinion reflect page numbers assigned by this District's Electronic Case Filing system.  Citations to depositions reflect the transcript page numbers.

returns were handled by Gupta's "family's tax accountant." (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 11; Gupta Dep. (Dkt. No. 88-92) at 24-25)

Gupta does not recall whether he was the manager of Mindspirit (Gupta Dep. (Dkt. No. 88-92) at 16 ("I don't know [if I was a manager.] It was just an investment vehicle.")), but assumes as much. (Id. at 27 ("Q. Is Mr. Kumar correct when he states, at least as of January 25th, 2001, that you would be the signatory on behalf of Mindspirit, LLC and the manager? A. Based on what I saw, I signed those documents so [I] must have been."))

According to Kumar, his wife Malvika was responsible for "[being] aware of" Mindspirit's investments, and "ensur[ing] that Mindspirit complie[d] with all laws and filings." (Kumar Dep. (Dkt. No. 88-90) at 34-35) Mindspirit's only investment was in Evalueserve, however. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 58)

Evalueserve is a Bermuda company that was incorporated on October 25, 2000. (Id. ¶ 13) Its main office is in Gurgaon, India. (Id. ¶ 14) Evalueserve was founded by Alok Aggarwal ("Aggarwal") and Marc Vollenweider to provide consulting services. (Id. ¶¶ 16-17; Vollenweider Dep. (Dkt. No. 88-62) at 58-60) From Evalueserve's formation until 2013, Aggarwal and Vollenweider were its only directors. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 18) Aggarwal also served as executive chairman, while Vollenweider served as chief executive officer through December 2016. (Id.) Vollenweider is still a member of Evalueserve's board. (Id. ¶ 19)

**B.    The Agreement**

In late December 2000 or early January 2001, Aggarwal, Vollenweider, Gupta, and Kumar began discussions about Gupta and Kumar becoming "angel investors" in Evalueserve. (Id. ¶ 40) At some point in January or February 2001, Aggarwal, Vollenweider,

and Gupta met at Gupta's office to discuss the potential investment. (Id. ¶ 51) According to Aggarwal, about "a week or so later, [Gupta] [] said that he would like to invest with Anil Kumar through . . . Mindspirit . . . ." (Aggarwal Dep. (Dkt. No. 88-54) at 28)

On April 20, 2001, Evalueserve sent Gupta several transaction documents drafted by Evalueserve reflecting the arrangement between Evalueserve and Mindspirit, including a Stock Option Grant Notice ("Grant Notice"), a Stock Option Agreement, the Evalueserve, Ltd. 2001 Equity Incentive Plan ("Equity Incentive Plan"), and a Securities Purchase Agreement ("Purchase Agreement"). (See Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 82) ¶ 3; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 87) Vollenweider had signed these documents and dated them April 17, 2001. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 87) A cover letter included with these documents asks Gupta to sign and return all of the documents to Aggarwal (id. ¶ 88), but no party to this suit has produced a countersigned copy of any of these documents. (Id. ¶ 89) Gupta received the documents and retained them in Mindspirit's files, however, and Kumar received and retained at least the Grant Notice, the Stock Option Agreement, and the Equity Incentive Plan. (Id.)[3]

### 1. **The Grant Notice**

The April 17, 2001 Grant Notice provides that "Evalueserve, Ltd. (the 'Company'), pursuant to its Evalueserve, Ltd. 2001 Equity Incentive Plan (the 'Plan') hereby grants to you (the 'Optionholder') an option to purchase the number of shares of the Company's Common Stock set forth below." (Grant Notice (Dkt. No. 86-3) at 2)

---

[3] Although no fully executed copy of the Grant Notice, Stock Option Agreement, and Purchase Agreement exists, the parties agree that these are binding agreements. (See Def. Br. (Dkt. No. 87) at 11; Pltf. Br. (Dkt. No. 74) at 5-6)

The Grant Notice identifies Mindspirit as the "Optionholder"; the date of the grant as April 17, 2001; the number of shares subject to option as 480,000; the exercise price as $0.56; and the nature of the options as "nonstatutory stock options." (Id.) The Grant Notice includes a vesting schedule, with options for 160,000 shares vesting on April 17, 2002; options on an additional 160,000 shares vesting on April 17, 2003; and options on the remaining 160,000 shares vesting on April 17, 2004. (Id.) The Grant Notice provides that all options will expire on April 16, 2006. (Id.)

Under a section entitled "Additional Terms/ Acknowledgements," the Grant Notice states:

> The undersigned Optionholder acknowledges receipt of, and understands and agrees to, this Grant Notice, the Stock Option Agreement and the [Equity Incentive] Plan. Optionholder further acknowledges that as of the Date of Grant, this Grant Notice, the Stock Option Agreement and the [Equity Incentive] Plan set forth the entire understanding between Optionholder and the Company regarding the acquisition of stock in the Company under the [Equity Incentive] Plan and supersede all prior oral and written agreements on the subject with the exception of (i) options previously granted and delivered to Optionholder under the [Equity Incentive] Plan, and (ii) the following agreements only: _____.

(Id.)[4]

The Grant Notice further provides that, "[t]his option is subject to all of the terms and conditions as set forth herein and in the Stock Option Agreement between the Company and the Optionholder, the [Equity Incentive] Plan and the Notice of Exercise, all of which are . . . incorporated [] in their entirety." (Id.)

### 2. **The Stock Option Agreement**

The Stock Option Agreement provides that,

> [p]ursuant to your Stock Option Grant Notice ("Grant Notice") and this Stock Option Agreement, and in consideration of the help and guidance to be provided

---

[4] No other agreements are listed. (Grant Notice (Dkt. No. 86-3) at 2)

by you to it, Evalueserve Ltd. (the "Company") has granted you (the "Optionholder") an Option under its Evalueserve, Ltd. 2001 Equity Incentive Plan (the "Plan") to purchase the number of shares of the Company's Common Stock indicated in your Grant Notice at the exercise price indicated in your Grant Notice.

(Stock Option Agreement (Dkt. No. 86-3) at 4)

Section 5 of the Stock Option Agreement states:

**SECURITIES LAW COMPLIANCE.** Notwithstanding anything to the contrary contained herein, you may not exercise your Option unless the shares of Common Stock issuable upon such exercise are then registered under the Securities Act or, if such shares of Common Stock are not then so registered, the Company has determined that such exercise and issuance would be exempt from the registration requirements of the Securities Act. The exercise of your Option must also comply with other applicable laws and regulations governing your Option, and you may not exercise your Option if the Company determines that such exercise would not be in material compliance with such laws and regulations.

(Id. at 5)

Section 8 of the Stock Option Agreement provides that "[y]our Option is not transferable." (Id.) Section 9 of the Stock Option Agreement provides: **"RIGHT OF FIRST REFUSAL UPON PROPOSED SALE.** The provisions of Sections 4 through 6 of that certain Securities Purchase Agreement of even date herewith between the Company and you shall be applicable to all shares of Common Stock acquired by you upon exercise of an Option." (Id.)

Section 11 of the Stock Option Agreement provides that

[y]our Option is subject to all the provisions of the [Equity Incentive] Plan, the provisions of which are hereby made a part of your Option, and is further subject to all interpretations, amendments, rules and regulations which may from time to time be promulgated and adopted pursuant to the [Equity Incentive] Plan. In the event of any conflict between the provisions of your Option and those of the [Equity Incentive] Plan, the provisions of the [Equity Incentive] Plan shall control.

(Id.) Section 13 of the Stock Option Agreement provides that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of New York, except that body of law relating to choice of laws." (Id. at 6)

### 3. The Equity Incentive Plan

The Equity Incentive Plan was adopted by Evalueserve's shareholders on January 5, 2001. (Equity Incentive Plan (Dkt. No. 86-3) at 9) Section 1(a) of the Equity Incentive Plan provides that, "[t]he persons eligible to receive Option Awards are the Employees and Directors of and Consultants to the Company and its Affiliates." (Id. at 9) Section 5(a) similarly provides that "Nonstatutory Stock Options may be granted to Employees, Directors and Consultants." (Id. at 14) Section 2(g) defines "Consultant" as "any person, including an advisor, (i) engaged by the Company or an Affiliate to render consulting, advisory or professional services and who is compensated for such services. . . ." (Id. at 10)

Sections 2(b) and 3 of the Equity Incentive Plan give the Evalueserve Board of Directors the

power, subject to, and within the limitations of, the express provisions of the Plan:

i. To determine . . . which of the persons eligible under the Plan shall be granted Option Awards; when and how much each Option Award shall be granted; what type or combination of types of Option Award shall be granted; the provisions of each Option Award granted . . . ; and the number of shares of Common Stock with respect to which an Option Award shall be granted to each such person.

ii. To construe and interpret the Plan and Option Awards granted under it, and to establish, amend and revoke rules and regulations for its administration. The Board, in the exercise of this power, may correct any defect, omission or inconsistency in the Plan or in any Option Agreement, in a manner and to the extent it shall deem necessary or expedient to make the Plan fully effective.

iii. To amend the Plan or a[n] Option Award as provided in Section 11. . . .

(Id. at 13)

Section 11(e) of the Equity Incentive Plan provides that "the rights under any Option Award shall not be impaired by any [] amendment unless (i) the Company requests the consent of the Participant and (ii) the Participant consents in writing." (Id. at 22)

Section 5(d)(i) of the Equity Incentive Plan provides that,

[prior to the date on which a registration statement under the Securities Act relating to the Common Stock is declared effective by the Securities and Exchange Commission], a Consultant shall not be eligible for the grant of an Option Award if, at the time of grant, either the offer or the sale of the Company's securities to such Consultant is not exempt under Rule 701 because of the nature of the services that the Consultant is providing to the Company, or because the Consultant is not a natural person, or as otherwise provided by Rule 701, unless the Company determines that such grant need not comply with the requirements of Rule 701 and will satisfy another exemption under the Securities Act as well as comply with the securities laws of all other relevant jurisdictions.

(Id. at 15)

Section 6(g) of the Equity Incentive Plan states:

**Transferability of a Nonstatutory Stock Option.** A Nonstatutory Stock Option shall be transferable to the extent provided in the Option Agreement. If the Nonstatutory Stock Option does not provide for transferability, then the Nonstatutory Stock Option shall not be transferable except by will or by the laws of descent and distribution and shall be exercisable during the lifetime of the Optionholder only by the Optionholder.

(Id. at 16-17)

Section 7(b) of the Equity Incentive Plan states:

**Securities Law Compliance.** The Company shall seek to obtain from each regulatory commission or agency having jurisdiction over the Plan such authority as may be required to grant Option Awards and to issue and sell shares of Common Stock upon exercise of the Option Awards, provided, however, that this undertaking shall not require the Company to register under the Securities Act the Plan, any Option Award or any Common Stock issued or issuable pursuant to any such Option Award. If, after reasonable efforts, the Company is unable to obtain from any such regulatory commission or agency the authority that counsel for the Company deems necessary for the lawful issuance and sale of Common Stock under the Plan, the Company shall be relieved from any liability for failure to

issue and sell Common Stock upon exercise of such Option Awards unless and until such authority is obtained.

(Id. at 18)

Section 15 of the Equity Incentive Plan provides that "[t]he law of the State of New York shall govern all questions concerning the construction, validity and interpretation of this Plan, without regard to such state's conflict of laws rules." (Id. at 24)

### 4. The April 17, 2001 Purchase Agreement

Section 1.2 of the Purchase Agreement states:

> Grant of Options. In consideration of certain help and guidance being provided by the Investor to the Company, concurrently herewith the Company is granting to the Investor an option (the "Option") to purchase that number of shares of its Common Stock pursuant to its 2001 Equity Incentive Plan as is set forth on Schedule A.

(SPA (Dkt. No. 86-5) at 2) Schedule A provides that the "Investor" is "Mindspirit LLC"; that Mindspirit has purchased 180,000 shares of Evalueserve's common stock; that the purchase price of the stock was $100,000; and that the "Number of Shares Subject to Option" is 480,000. (Id. at 11)

Section 2.5 of the Purchase Agreement provides:

> Other than as is set forth on Schedule B attached hereto, no consent, approval, order, or authorization of, or registration, qualification, designation, declaration or filing with, any Bermudian, United States Federal or state or foreign governmental authority on the part of the Company is required in connection with (i) the consummation of the transactions contemplated by this Agreement or the Option Agreement or (ii) the offer, issuance, sale and delivery of the Shares and Options.

(Id. at 3) Schedule B provides that "[t]he consent of the Bermuda Monetary Authority must be procured for the issuance of the Common Stock and the Option to the Investor." (Id. at 12)

### C.  Consideration and Performance

On September 20, 2001, Gupta caused Rosewood to pay $100,000 to Evalueserve on Mindspirit's behalf. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 120)  In connection with that payment, Kumar gave Gupta $25,000 at a later date. (Kumar Dep. (Dkt. No. 88-90) at 62)  Kumar states that the $25,000 came from his wife, Malvika Kumar. (Id. at 80)  Although Gupta and Kumar testified that they did not agree to provide any "help and guidance," or consulting services, to Evalueserve (see Gupta Dep. (Dkt. No. 88-92) at 34-35; Kumar Dep. (Dkt. No. 88-90) at 27-28, 44-45, 48), they nonetheless provided some assistance to Evalueserve. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 117)  For example, Gupta contacted at least one other "angel investor" about Evalueserve (Gupta Dep. (Dkt. No. 88-92) at 31-32), and remembers having discussions with Evalueserve regarding "their clients" and what Evalueserve was "trying to do." (Id. at 38)  Kumar recalls "going through" a "spreadsheet of names" with Aggarwal.[5] (Kumar Dep. (Dkt. No. 88-90) at 50-51)

During the first four months of 2002, Evalueserve's Board adopted a resolution approving the issuance of 180,000 shares of common stock to Mindspirit. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 136)  Evalueserve's Board also adopted a resolution listing Evalueserve's "optionee[s]" as Gupta and Kumar individually – with 360,000 options and 120,000 options, respectively – rather than Mindspirit. (See Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 82) ¶ 4; Evalueserve Board Resolution (Dkt. No. 76-6))  The resolution was signed by Vollenweider – as Evalueserve's chief executive officer and director – on April 8, 2002, and by Aggarwal – as Evalueserve's chairman and director – at an unspecified time. (Pltf. Resp. to Def.

---

[5]  It is not clear from Kumar's deposition whether the spreadsheet of names reflected potential investors or potential clients.

R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 18, 137)  Mindspirit did not receive a copy of this Board

resolution until this litigation ensued.  (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 82) ¶ 5)

Vollenweider and Nand Gangwani – Evalueserve's chief financial officer since

January 2008 (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 15) – testified that Evalueserve

needed the options to be in the names of individuals for regulatory reasons, and that they

obtained Gupta's permission to change the option holder(s) from Mindspirit to Gupta and

Kumar.  (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 82) ¶ 6)  Aggarwal testified, however, that

Gupta orally requested the change, and that Evalueserve agreed to make the change as "a favor"

to Gupta.  (Id. ¶ 7)  Gupta recalls no such conversation (Gupta Dep. (Dkt. No. 88-92) at 99), and

Kumar testified that Gupta never told him about any such conversation.  (Kumar Dep. (Dkt. No.

88-90) at 78-79)  There is no written amendment to either the Grant Notice or the Stock Option

Agreement that reflects such a change.  (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 82) ¶ 10)

**D.**     **Approval from the Bermuda Monetary Authority**

Under Bermuda law, the Bermuda Monetary Authority (the "BMA") must

approve the issuance of any equity security by a Bermuda company to a non-resident of

Bermuda, unless general permission has been given.  (See Part IV of the Bermuda Exchange

Control Regulations, Section 12(1) (Dkt. No. 84-2) at 11 ("Except with the permission of the

[Bermuda Monetary Authority], no person shall in Bermuda issue any security or, whether in

Bermuda or elsewhere, issue any security which is registered or to be registered in Bermuda, [to

a non-resident of Bermuda].”); Richardson-Augustus Decl. (Dkt. No. 88-35) ¶ 10 ("Under

Bermuda law, the Bermuda Monetary Authority (the 'BMA') must approve the issuance of any

equity security by a Bermuda company to a non-resident of Bermuda, other than in cases where

general permission has been given."); U.S. Dep't of State 2014 Investment Climate Statement for

Bermuda (Dkt. No. 84-5) at 7 ("For exchange control purposes, the BMA must give prior approval for issues to and transfers of securities in Bermuda companies involving non-residents, except where general permission has been granted pursuant to the Notice of Public of June 2005."))

In a May 6, 2002 letter to the BMA, Evalueserve's Bermuda counsel – Appleby, Spurling & Kempe – sought approval for Evalueserve to issue 180,000 shares to Mindspirit, and on May 14, 2002, the BMA granted permission. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 132, 148-49) On October 8, 2002, Evalueserve issued a certificate for 180,000 shares to Mindspirit. (Id. ¶ 152) On October 11, 2002, Aggarwal sent a subscription sheet to Gupta for the 180,000 shares, and Gupta signed it and returned it on behalf of Mindspirit. (Id. ¶ 153) Evalueserve sent the certificate to Mindspirit, in care of Gupta, on October 21, 2001. (Id. ¶ 152) Gupta gave the stock certificate to his accountant. (Id.)

On October 15, 2002, the Appleby firm wrote to the BMA seeking approval for Evalueserve to issue 360,000 options to Gupta and 120,000 options to Kumar, and on October 18, 2002, the BMA granted permission. (Id. ¶¶ 155-56) After BMA approval, Evalueserve recorded the options in Gupta and Kumar's names on its books. (Id. ¶ 157; Vollenweider Dep. (Dkt. No. 88-62) at 137, 166, 198) The options recorded in the names of Gupta and Kumar were the options for which Mindspirit had bargained. (See Vollenweider Dep. (Dkt. No. 88-62) at 119-21; Gangwani Dep. (Dkt. No. 88-77) at 79-80)

**E.    Evalueserve Extends the Expiration Date of the Options; 2009-2011 Communications Regarding the Options; and the Bermuda Monetary Authority's Rejection of the Attempt to Exercise the Options**

In March 2006, Evalueserve's Board extended the expiration date for all outstanding options to April 6, 2011. (See March 2006 Evalueserve Resolutions (Dkt. No. 88-

61) at 2; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 167; Vollenweider Dep. (Dkt. No. 88-62) at 176 (testifying that the March 2006 extension was "a blanket extension" that "applie[d] to all the [outstanding] stock options")) Unaware of this action by Evalueserve's board, and aware that the Grant Notice provides that the options referenced in the Grant Notice will expire on April 16, 2006 (Grant Notice (Dkt. No. 86-3) at 2), Kumar became concerned in June 2006 that the options had expired. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 162; Kumar Dep. (Dkt. No. 88-90) at 82-83 ("[I]t occurred to me, based on my recollection of the stock option agreement, that it had a five-year expiration[,] and I was confused as to whether the expiration would be April 17th, 2006, which is per the stock option agreement, or whether [the options would expire five years from] the date the money was sent [from Rosewood to Evalueserve].")) Accordingly, on June 25, 2006, Kumar sent an email to Aggarwal with two questions: (1) the "Date of wire to Bermuda (late 2001?) – for USA 100,000/ - for 180K shares"; and (2) the "Split of the 480K options on your books between RKG and me." (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 161) Notwithstanding the language in Kumar's email, Kumar claims that – at that time – he believed the options were in Mindspirit's name. (Kumar Dep. (Dkt. No. 88-90) at 177-78 ("Q. . . . As of this point, 2006, did you understand these options to be in your personal name? A. No."))

On June 29, 2006, Aggarwal responded to Kumar's e-mail as follows: "The money was transferred to Bermuda on September 21, 2001," and "360K options were granted to Rajat Gupta and 120K to Anil Kumar. These options were granted on November 7, 2001 at $.5556 per share." (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 165) Gupta does not recall whether Kumar passed this information on to him. (Id. ¶ 166)

Kumar testified that although Aggarwal speaks of options being granted to Gupta

and Kumar, he nonetheless understood Aggarwal to mean "[t]hat [the options] were split within

Mindspirit of the two families." (Kumar Dep. (Dkt. No. 88-90) at 178) Kumar claims that he

believed all along that the options were in Mindspirit's name. (Pltf. Resp. to Def. R. 56.1 Stmt.

(Dkt. No. 86) ¶ 171) In a telephone conversation after Aggarwal's June 29, 2006 email,

Aggarwal told Kumar that the expiration date of outstanding options had been extended, and that

the options at issue would not expire in 2006. (See Kumar Dep. (Dkt. No. 88-90) at 89-91

(testifying that Aggarwal told him "'[d]on't worry about [expiration in] 2006'" and that "'[a]ll

the other option holders have also got[ten] extended'"))

Gupta testified that he expected that Evalueserve was monitoring the expiration

date of the options and would contact him if the options were about to expire. (Pltf. Resp. to

Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 163) Gupta does not know why the options were not

exercised by 2006. (Id. ¶ 172)

On June 18, 2009 – three years later – J. Aaron Deuser, Gupta's accountant, sent

an email to Gangwani, Evalueserve's chief financial officer, entitled "stock option grant." (Jan.

27, 2010 Gangwani email chain (Dkt. No. 88-124) at 5-6) The body of the email indicates that

Gupta believed that the options had expired:

> . . . I'm the accountant for Rajat Gupta. I just had a brief discussion with Mr.
> Gupta regarding his expired stock options in Evalueserve. He requested that I set
> up a meeting between us, our tax account[ant] and yourself to discuss the details
> associated with an alternative method of capturing that value. . . .

(Id. at 2) In emails with Evalueserve over the following year, Deuser never mentioned

Mindspirit or Rosewood, and consistently referred to the options as Gupta's options. (See

generally id.; June 3, 2010 Gangwani email chain (Dkt. No. 88-126)) Deuser claims, however,

that, "in many instances," he "just used Mr. Gupta as a placeholder," because if he "reach[ed] out

to a company and [said] . . . Mindspirit or Rosewood or something like that, typically nobody knows what I'm talking about. . . . [W]hile they might be aware of an entity that he used, referencing Mr. Gupta was the most common practice." (Deuser Dep. (Dkt. No. 88-91) at 16-17)

In a July 12, 2010 email, Karmeshu Aggarwal ("K. Aggarwal") – Evalueserve's "head of accounting or head of finance" (Vollenweider Dep. (Dkt. No. 88-62) at 100) – told Deuser that, "[r]egarding [s]tock options – there are 360,000 options granted in year 2001 @ USD 0.5556 per option as exercise price. We would request Rajat to exercise these options [within] the next three months. . . ." (July 31, 2010 K. Aggarwal email chain (Dkt. No. 86-31) at 4) Gupta does not recall receiving this information from Deuser at that time. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 200) Gupta claims that he believed the options were in Rosewood's name. (See Gupta Dep. (Dkt. No. 88-92) at 67-68)

In a July 21, 2010 email to K. Aggarwal, Deuser said:

> I appreciate your taking the time to speak with me just now regarding the stock options.
>
> One follow up question I did have, I just pulled out the original stock paperwork I have[,] and [] it looks like the[] options were originally issued to Mindspirit LLC. I know we just talked about this[,] but can you please confirm the options were previously transferred to both Rajat and Anil.
>
> Rajat should have 360,000 and Anil should have 120,000.

(Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 203) In response, K. Aggarwal asked Deuser to "send [him] a copy of the paperwork." (July 21, 2010 K. Aggarwal email (Dkt. No. 88-130) at 1)

In an August 26, 2010 email to Gangwani, Evalueserve's CFO, Deuser said:

> Mr. Gupta and Mr. Kumar have requested that we try to split up the Mindspirit entity that is owned by the two of them. Is it possible to have the new options issued in each individual's name?

(Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 204)  In response, Gangwani wrote, "I will let Karmeshu [Aggarwal] get back to you on [that question]."  (Aug. 26, 2010 Gangwani email (Dkt. No. 88-132) at 2)

In August 2010, Evalueserve's Board extended the expiration date for all outstanding options to April 6, 2016.  (See August 2010 Evalueserve Resolutions (Dkt. No. 88-71); Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 167; Vollenweider Dep. (Dkt. No. 88-62) at 178-79; Aggarwal Dep. (Dkt. No. 88-54) at 159-60)

On October 4, 2010, K. Aggarwal emailed Deuser copies of September 1, 2010 letters addressed to Kumar and Gupta.  (October 4, 2010 Deuser email chain and attachments (Dkt. No. 88-108) at 2, 6-7)  Both letters state: "[w]ith reference to [the] stock options granted to you by Evalueserve on 7 November 2001, please be noted that pursuant to resolutions approved by the Board of Directors on August 31, 2010, the expiration date of the said options with the Company stands extended to April 6, 2016."  (Id. at 6-7)  In his October 4, 2010 email to Deuser, K. Aggarwal writes: "please note that these [options] are in individual names."  (Id. at 2)  Deuser forwarded the extension letters to Gupta and Kumar that same day.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 205)  Gupta does not recall receiving this email from Deuser, and does not know whether he ever saw the extension letter.  (Id. ¶ 206)

In a December 9, 2010 email to Vikas Agarwal, an Evalueserve employee, Kumar inquired about transferring the 180,000 shares of Evalueserve stock held by Mindspirit to Malvika Kumar and Rosewood.  (December 15, 2010 Agarwal email chain (Dkt. No. 88-78) at 5-6 ("Mindspirit is owned by Rajat's family partnership (Rosewood) and Malvika Kumar (my wife).  How do we change the name on the purchased shares to Rosewood and Malvika?"))  In response, Vikas Agarwal told Kumar that Malvika Kumar and a representative of Rosewood – as

the partners of Mindspirit – would need to approve the transfer. (Id. at 3) Approximately two months later, on February 10, 2011, Evalueserve – at the request of Malvika Kumar and Rosewood – transferred the 180,000 shares of Evalueserve stock held by Mindspirit to Malvika Kumar and Rosewood. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 212)

Kumar testified that once Mindspirit's shares in Evalueserve were transferred, there was no more reason for Mindspirit to exist. (Kumar Dep. (Dkt. No. 88-90) at 133 ("Q. So when the shares transferred, there was no more reason to have Mindspirit? A. That's correct.")) That same month – February 2011 – Gupta closed Mindspirit's bank account. (Feb. 10, 2011 Gupta Ltr. (Dkt. No. 88-146) at 2) After Mindspirit's bank account was closed, Deuser emailed Kumar, stating, inter alia, "FYI . . . the Mindspirit account at [JPMorgan] was closed yesterday as well so I believe that completes everything else," to which Kumar responded, "Perfect. Thanks." (Feb. 11, 2011 Kumar email chain (Dkt. No. 88-115) at 2) According to Deuser, Gupta closed Mindspirit's bank account because "we were dissolving Mindspirit, and once everything was allocated out to Rosewood and Malvika, there was no need to keep the bank account open." (Deuser Dep. (Dkt. No. 88-91) at 61)

In April 2011, Evalueserve contacted Gupta and Kumar and told them that – for tax reasons – they should immediately exercise the options listed in their names. (See Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 82) ¶ 11)[6]

---

[6] The witnesses have different recollections as to who would suffer negative tax consequences if the options were not exercised. Gupta recalls Aggarwal saying that there would be "dire tax consequences" if the options were not exercised, but does not recall for whom. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 218) Deuser recalls the issue being tax consequences for Evalueserve. (Id. ¶ 219) Kumar believes that it was Evalueserve that would suffer negative tax consequences, and "possibly [Kumar and Gupta]." (Kumar Dep. (Dkt. No. 88-90) at 137)

On April 16, 2011, Deuser emailed Evalueserve a "Stock Option Exercise notice for Rajat Gupta," and stated that "[w]e would like to exercise the option immediately. . . ." (April 16, 2011 Deuser email (Dkt. No. 88-134) at 3)  On April 17, 2011, Kumar emailed Evalueserve a completed notice of exercise form, in which Kumar sought to exercise 120,000 options.  (April 17, 2011 Kumar email chain and attachment (Dkt. No. 88-116) at 2, 4-5) Gupta's notice of exercise form was filled out in his name for his own benefit.  (Gupta Notice of Exercise (Dkt. No. 88-135) at 7-8)  Kumar's notice of exercise form was filled out in his name for the benefit of the Kumar Revocable Trust.  (Kumar Notice of Exercise (Dkt. No. 88-116) at 4)  Neither notice of exercise form mentioned Mindspirit.

On April 18, 2011, Evalueserve sent to Kumar and Deuser the compliance forms for the Bermuda Monetary Authority, showing the corporate record entries for their options. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 216)  Kumar completed and signed the forms, and returned them that same day.  (Id.)  Kumar applied to have the Evalueserve shares issued in the name of the Kumar Revocable Trust.  (Id. ¶ 222)  On April 21, 2011, Aggarwal informed Kumar by email that the "corresponding shares will be in your name and not in your trust's name or any other name."  (Id. ¶ 223)  Kumar replied in an April 22, 2011 email stating, "No problem. Can easily have it in my name."  (Id. ¶ 224)

On April 25, 2011, Gupta completed and signed stock option exercise paperwork, including compliance forms, and gave these documents to Deuser, who sent them to Evalueserve.  (Gupta Dep. (Dkt. No. 88-92) at 79-81; Deuser Dep. (Dkt. No. 88-91) at 69-70; April 25, 2011 Deuser email chain and attachments (Dkt. No. 88-135); April 25, 2011 Gupta email chain and attachments (Dkt. No. 88-147))

Gupta maintains that, even at this point, it was not clear to him that the options were in his name. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 226) Gupta and Kumar say that they were not then aware that exercising Evalueserve options required the approval of the Bermuda Monetary Authority. (Id. ¶ 227)

On May 9, 2011, the Appleby firm submitted Gupta's application to exercise the options to the Bermuda Monetary Authority. (Wilson Decl. (Dkt. No. 88-25) ¶ 5; June 22, 2011 Appleby email and attachments (Dkt. No. 88-26)) On May 10, 2011, Appleby submitted to the BMA Kumar's application to exercise the options. (Wilson Decl. (Dkt. No. 88-25) ¶ 5; June 22, 2011 Appleby email and attachments (Dkt. No. 88-27))

On June 8, 2011, the BMA notified the Appleby firm that it had rejected Kumar's and Gupta's applications to exercise the options. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 230) The record does not reflect why the BMA rejected the applications to exercise the options. Aggarwal notified Kumar and Gupta that the BMA had rejected their exercise of the options. (Id. ¶¶ 231-32)

F.   **Communications After the Bermuda Monetary
     Authority Rejects the Attempt to Exercise the Options**

Evalueserve offered to re-submit Kumar's and Gupta's applications to the BMA. (See Vollenweider Dep. (Dkt. No. 88-62) at 195) Kumar never re-submitted his application to exercise the options, however, because he "thought the right way was [] actually not to work with the [BMA], but to get the options transferred back to where they belonged" – that is, "with Mindspirit." (Kumar Dep. (Dkt. No. 88-90) at 153-55)

Gupta initially instructed Deuser to pursue re-application, and on October 21, 2011, Deuser asked Aggarwal whether the existing paperwork would suffice for the re-application, or whether additional paperwork was needed. (Pltf. Resp. to Def. R. 56.1 Stmt.

(Dkt. No. 86) ¶¶ 242, 244) On February 7, 2012, Navneet Sharma – an Evalueserve manager –

sent Deuser an email regarding "the process of re-submitting the application of Rajat Gupta's

exercise of stock options with [the] Bermuda Monetary Authority." (March 2, 2012 Gangwani

email chain (Dkt. No. 76-19) at 3-4) Sharma asked Deuser to "arrange for Mr. Gupta to

complete the attached Personal Declaration." (Id. at 4)

> In response, Deuser sent the following email that same day:

> Prior to moving forward with exercise of the options, I have one outstanding
> concern that hasn't been fully addressed. . . .

> Given that the stock options were originally issued in the name of Mindspirit and
> were not transferable according to article 1.8 of the agreement, I believe the
> options should still be held in the name of Mindspirit, or its owners Rosewood
> Partners and Malvika Kumar.

> Can Evalueserve confirm this is the company's understanding as well? If not,
> would someone be able to provide additional explanation regarding the transfer of
> options to Mr. Gupta?

(Id. at 3) The next day, Sharma responded, "Sure, I will look into this and get back to you at the

earliest." (Id. at 2)

> Three weeks later, in a February 29, 2012 email, Deuser wrote to Sharma "to

quickly follow up . . . on the [] issue regarding transferring the stock options back (or reversing

the original transfer) into the name of Mindspirit or its owner Rosewood. Please let me know if I

can provide any additional information on our end to assist in the process." (Id.) In a March 2,

2012 email, Gangwani, who had been copied on the emails exchanged between Deuser and

Sharma, wrote:

> I have been on the road and couldn't get back you[] earlier. We cannot transfer
> the options to Mindspirit. Also there wasn't error in assigning the stock options
> to Rajat Gupta. While the original grant letter was made in the name of
> Mindspirit, [] when it went to Rajat Gupta for signing he called Alok Aggarwal
> (Chairman and co-founder of Evalueserve) and asked him to make it in the names
> of Rajat Gupta and Anil Kumar instead (with two thirds of the options going to

21

Rajat Gupta and one-third to Anil Kumar). It was based on this request from
Rajat Gupta that the revised grant letter was sent to the Bermuda authorities for
BMA approval and recording.

(Id. at 2)

In a May 30, 2012 letter to Evalueserve, John Granda – counsel to Gupta –
"request[ed] on Mr. Gupta's behalf that the so-called 'Gupta Options' be transferred to
Rosewood Partners," and "withdr[e]w any prior request from Mr. Gupta or his representatives to
exercise the so-called Gupta Options." (May 30, 2012 Granda Ltr. (Dkt. No. 88-31) at 4)

In a December 14, 2012 letter, Granda requested that Evalueserve either "effect a
cashless exercise of the options to purchase 360,000 shares . . . originally granted to Mindspirit
LLC" "[c]oncomitant with the sale of shares to [a] third party" or "[i]mmediately effect the
transfer of the Option to Rosewood Partners." (Dec. 14, 2012 Granda Ltr. (Dkt. No. 88-32) at 3)

In a December 20, 2012 letter, Granda reported that he had also been retained by
Kumar and his wife, Malvika Kumar, "with respect to an option to purchase 120,000 shares . . .
originally issued to Mindspirit LLC (the 'Option')." (Dec. 20, 2012 Granda Ltr. (Dkt. No. 88-
33) at 3) Granda requested that Evalueserve either "effect a cashless exercise of the Option"
"[c]oncommitant with the sale of shares to [a] third party" or "[i]mmediately effect the transfer
of the Option to Malvika Kumar." (Id.)

In response to Granda's letters, Evalueserve's counsel denied the requests to
transfer the options to Rosewood and Malvika Kumar, and reiterated that Evalueserve was
willing to re-submit an application to the BMA for the exercise of both Kumar's and Gupta's
options. (See Dec. 27, 2012 Rimland Ltr. (Dkt. No. 88-34))

### G.    The Buy-Back Program

As part of a buy-back program initiated on December 20, 2013, Evalueserve offered to purchase shares received by option holders upon the exercise of their options, up to a maximum of "50% of the [the option holder's] vested options." (See Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 82) ¶ 18; Dec. 20, 2013 Evalueserve Buy Back Program (Dkt. 86-21) at 3-4) Evalueserve offered Kumar the opportunity to participate in the buy-back program as an option holder, but he decided not to participate because he believed that the offer was "[u]ndervalued." (Kumar Dep. (Dkt. No. 88-90) at 169-70) Gupta testified that Rosewood did not participate in the buy-back program because it was only offered the opportunity to sell its shares, and was not given an opportunity to sell shares obtained through the exercise of the options. Gupta did not wish to acknowledge what he understood to be Evalueserve's offer to buy back only Rosewood's shares. (Gupta (Dkt. No. 88-92) at 108 ("I thought that Rosewood owned both shares and options, and for some reason, the option part of it was not sent to me, and . . . I didn't want to acknowledge it partially."))

## II.    PROCEDURAL HISTORY

Plaintiffs Mindspirit, LLC, Malvika Kumar, and Rosewood Partners filed the Complaint on August 3, 2015 (Dkt. No. 1), and filed the Amended Complaint on January 13, 2016. (Dkt. No. 19) The Amended Complaint asserts claims for (1) breach of contract; (2) "negligent [and] careless performance of contractual work"; (3) breach of the implied duty of good faith and fair dealing; (4) breach of fiduciary duty; (5) fraudulent concealment and misrepresentation by a fiduciary; (6) "actual & constructive fraud in contract and course of contract"; (7) unjust enrichment; (8) gross negligence; (9) promissory estoppel; (10) securities fraud; and (11) equitable estoppel. (Id.) On February 23, 2016, Evalueserve moved to dismiss all of Plaintiffs' claims, pursuant to Fed. R. Civ. P. 12(b)(1) and (6), on the grounds that (1)

Malvika Kumar and Rosewood Partners lacked standing; (2) this Court lacked subject matter jurisdiction; and (3) Plaintiffs failed to state a claim. (Dkt. No. 22)

On April 4, 2016, Plaintiffs moved for a temporary restraining order to prevent the Evalueserve stock options at issue from expiring on April 6, 2016. (Dkt. No. 26) On April 5, 2016, this Court conducted a hearing on Plaintiffs' application (Dkt. No. 31), and on April 6, 2016, this Court issued an order denying Plaintiffs' request for a temporary restraining order, finding that Plaintiffs had not demonstrated (1) a likelihood of success on the merits; or (2) that they would suffer irreparable harm in the absence of a temporary restraining order. (Apr. 6, 2016 Order (Dkt. No. 38) at 3-7)

On September 26, 2016, this Court issued an order granting Evalueserve's motion to dismiss (1) Malvika Kumar and Rosewood Partners' claims, because they lacked standing; and (2) Mindspirit's claims other than breach of contract and unjust enrichment. (Sept. 26, 2016 Order (Dkt. No. 45))

Pending before the Court are (1) Evalueserve's motion for summary judgment on Mindspirit's remaining claims (Dkt. No. 78); and (2) Mindspirit's cross-motion for summary judgment on Evalueserve's statute of limitations and illegality defenses. (Dkt. No. 73)

## DISCUSSION

## I.    LEGAL STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no

24

genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, LLC, No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks and citation omitted)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment. . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (internal citations omitted).

## II.     BREACH OF CONTRACT CLAIM

Evalueserve has moved for summary judgment on Mindspirit's breach of contract claim on the following grounds:  (1) there was no breach of contract; (2) the parties' mutual mistake either (a) excuses any further performance by Evalueserve or (b) is grounds for reformation of the contract; (3) the doctrine of illegality bars the breach of contract claim; and (4) the claim is barred by the applicable statute of limitations.  (Def. Mot. (Dkt. No. 78))

Mindspirit has cross-moved for summary judgment on Evalueserve's statute of limitations and illegality defenses.  (Pltf. Mot. (Dkt. No. 73))

### A.     Applicable Law

"Under New York law,[7] there are four elements to a breach of contract claim: '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'"  Ellington Credit Fund, Ltd. v. Select

---

[7]  Although it is undisputed that the Stock Option Agreement, Equity Incentive Plan, and Purchase Agreement are all governed by New York law (see Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 104), and that the Grant Notice incorporates the Stock Option Agreement and Equity Incentive Plan by reference (see Grant Notice (Dkt. No. 86-3) at 2), Evalueserve argues that the Court must apply Bermuda law, because the "internal affairs doctrine" – a conflict of laws principle – "requires the application of Bermuda law to determine the relationship between Evalueserve and its securities holders."  (Def. Br. (Dkt. No. 87) at 13)

Evalueserve has not argued, however – let alone demonstrated – that the elements of a breach of contract claim under Bermuda law differ from the elements under New York law.  Accordingly, the Court will apply New York law with respect to the elements of a breach of contract claim. See Jonas v. Estate of Leven, 116 F. Supp. 3d 314, 330 (S.D.N.Y. 2015) ("[T]he party claiming foreign law applies carries both the burden of raising the issue that foreign law may apply in an action and the burden of proving foreign law to enable the district court to apply it in a particular case.") (internal quotation marks and citation omitted).  Evalueserve has likewise not argued or demonstrated that Bermuda's principles of contract interpretation differ from New York's. Accordingly, the Court will also apply New York's rules of contract interpretation.  Id.

As discussed below, even if Evalueserve had demonstrated that New York and Bermuda contract law differ, the internal affairs doctrine is inapplicable here.

Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)).

"Under New York law, 'if a contract is unambiguous on its face, its proper construction is a question of law' that may be resolved on summary judgment." LVP Assocs. L.L.C. v. Bank of China, New York Branch, No. 17 CV 5274 (SHS), 2017 WL 5514523, at *4 (S.D.N.Y. Nov. 16, 2017) (quoting Gaia House Mezz LLC v. State St. Bank & Tr. Co., 720 F.3d 84, 89 (2d Cir. 2013)). "[W]hether the contract is ambiguous is [also] a question of law for the court." Law Debenture Tr. Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 465 (2d Cir. 2010). "Contract provisions are unambiguous if they 'have a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion.'" LVP Assocs., 2017 WL 5514523, at *4 (quoting Breed v. Ins. Co. of N. Am., 46 N.Y.2d 351, 355 (1978)). By contrast, a contract is ambiguous "where its language is susceptible to multiple interpretations." Summit Health, Inc. v. APS Healthcare Bethesda, Inc., 993 F. Supp. 2d 379, 391 (S.D.N.Y. 2014) (citing Brad H. v. City of New York, 17 N.Y.3d 180, 186 (2011)). "Ambiguity will not be found," however, "where one party's view strains the contract language beyond its reasonable and ordinary meaning." Governmental Employees Ins. Co. v. Ohio Cas. Grp., 47 F. Supp. 3d 190, 194 (S.D.N.Y. 2014) (internal citations and quotation marks omitted); see also Hugo Boss Fashions, Inc. v. Federal Ins. Co., 252 F.3d 608, 616 (2d Cir. 2001) ("[A]mbiguity does not exist simply because the parties urge different interpretations.") (internal quotation marks and citation omitted).

"'[E]xtrinsic evidence may not be considered unless the [contract] itself is ambiguous.'" Summit Health, 993 F. Supp. 2d at 390 (quoting Kasowitz, Benson, Torres & Friedman, LLP v. Duane Reade, 98 A.D.3d 403, 406 (1st Dep't 2012)); see also Int'l Multifoods

Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002) ("[I]f the court finds that the contract is not ambiguous[,] it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence. . . .") (internal quotation marks and citations omitted). "When a contract is ambiguous and there is relevant extrinsic evidence as to the parties' intent, the proper interpretation of the disputed language [is generally] a question of fact for the jury." Summit Health, 993 F. Supp. 2d at 391 (citing Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992)); see also Fed. Ins. Co. v. Am. Home Assur. Co., 639 F.3d 557, 567 (2d Cir. 2011) ("[C]ontract claims are generally not subject to summary judgment[] if the resolution of the dispute turns on the meaning of an ambiguous term or phrase.").

  "Although a determination that a contract is ambiguous ordinarily requires denial of summary judgment, the court may nonetheless grant summary judgment where the extrinsic evidence illuminating the parties' intended meaning of the contract is so one-sided that no reasonable person could decide to the contrary." New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc., 599 F.3d 102, 115 (2d Cir. 2010) (internal quotation marks and citation omitted). "Similarly, summary judgment may be granted despite any ambiguities in the contract where there is no extrinsic evidence that would support a resolution of the ambiguities in favor of the nonmoving party's case." Id. (internal quotation marks and citations omitted). "These apparent exceptions merely reinforce the principle that the lynchpin of a summary judgment determination is, in most cases, the existence vel non of genuine issues of material facts." Id.

**B.**     **Mindspirit and Evalueserve's Agreement**
            **Concerning Evalueserve's Options Grant**

   **1.**     **Documents that Constitute the Agreement**

The Court concludes that Mindspirit and Evalueserve's agreement concerning an

options grant is reflected in the Grant Notice, the Stock Option Agreement, and the Equity

Incentive Plan. (See Grant Notice (Dkt. No. 86-3) at 2)  Sections 4, 5, and 6 of the Purchase

Agreement are incorporated by reference in the Stock Option Agreement pursuant to Section 9 of

the Stock Option Agreement. (Stock Option Agreement (Dkt. No. 86-3) at 5)  These documents

and provisions constitute Mindspirit and Evalueserve's agreement regarding Evalueserve's

options grant to Mindspirit (the "Agreement").

   **2.**     **The Recipient of the Options**

As to the first element of the breach of contract claim, while there is no dispute

that Mindspirit and Evalueserve entered into an agreement concerning a grant of Evalueserve

stock options (see Def. Br. (Dkt. No. 87) at 12; Pltf. Br. (Dkt. No. 74) at 5-6), there is a dispute

regarding "the parties receiving the options" pursuant to the Agreement. (See Pltf. Resp. to Def.

R. 56.1 Stmt. (Dkt. No. 86) ¶ 91)  According to Mindspirit, the parties agreed that Evalueserve

would provide Mindspirit with 180,000 shares of Evalueserve common stock and 480,000

Evalueserve stock options in exchange for a $100,000 investment in Evalueserve. (See Pltf. Br.

(Dkt. No. 74) at 5-6)  Mindspirit claims that the parties' agreement with respect to the recipient

of the options is "reflect[ed]" in the Grant Notice, which incorporates by reference the Stock

Option Agreement, the Equity Incentive Plan, and certain provisions of the Purchase Agreement.

(Pltf. R. 56.1 Stmt. (Dkt. No. 76) ¶ 3; see also Pltf. Opp. (Dkt. No. 85) at 13-14)

Evalueserve agrees that "the Grant Notice and attachments . . . provide most of

the terms concerning the options," but argues that these documents do not address "the parties

receiving the options." (Def. R. 56.1 Stmt. (Dkt. No. 88) ¶ 91) Evalueserve urges the Court to "apply a reasonable inference and read the [Grant Notice] to provide for issuance [of the options] to Gupta and A. Kumar." (Def. Br. (Dkt. No. 87) at 20)

### a. The Plain Meaning of the Grant Notice and Stock Option Agreement

With respect to the "parties receiving the options," the plain language of the Grant Notice and Stock Option Agreement indicates that Evalueserve agreed to provide options to Mindspirit. The Grant Notice identifies Mindspirit as the "Optionholder," and states that "Evalueserve, Ltd., pursuant to its Evalueserve, Ltd. 2001 Equity Incentive Plan . . . , hereby grants to you (the 'Optionholder') an option to purchase the number of shares of the Company's Common Stock set forth below." (Grant Notice (Dkt. No. 86-3) at 2) The Stock Option Agreement similarly provides that, "[p]ursuant to your Stock Option Grant Notice ('Grant Notice') and this Stock Option Agreement, . . . Evalueserve, Ltd. (the 'Company') has granted you (the 'Optionholder') an Option under its Evalueserve, Ltd. 2001 Equity Incentive Plan (the 'Plan') to purchase the number of shares of the Company's Common Stock indicated in your Grant Notice at the exercise price indicated in your Grant Notice." (Stock Option Agreement (Dkt. No. 86-3) at 4) These provisions have a "definite and precise meaning," LVP Assocs., 2017 WL 5514523, at *4, and reading these documents to issue options to any party other than Mindspirit would "strain[] the contract language beyond its reasonable and ordinary meaning." Governmental Employees Ins. Co., 47 F. Supp. 3d at 194.

### b. The Board's Authority to Amend Option Awards

In an effort to escape the plain meaning of these provisions, Evalueserve argues that interpreting the Agreement as providing options to Kumar and Gupta "is consonant with the

contractual terms, since the[] [Equity Incentive Plan] give[s] Evalueserve's board broad powers to construe, interpret and correct an Option Award." (Def. Br. (Dkt. No. 87) at 21)

Section 3(b) of the Equity Incentive Plan gives Evalueserve's board the authority to "construe and interpret the Plan and Option Awards granted under it," and to "correct any defect, omission or inconsistency in the Plan or in any Option Agreement." (Equity Incentive Plan (Dkt. No. 86-3) at 12-13) That power is expressly "subject to, and within the limitations of, the express provisions of the Plan" (id. at 12), however, and Section 11(e) of the Equity Incentive Plan provides that "the rights under any Option Award shall not be impaired by any [] amendment unless (i) the Company requests the consent of the Participant and (ii) the Participant consents in writing." (Id. at 22) There is no written amendment to either the Grant Notice or the Stock Option Agreement that lists Gupta and Kumar as the recipients of the options. (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 82) ¶ 10) Accordingly, interpreting the Grant Notice as providing options to Kumar and Gupta – based on the Evalueserve board's authority to amend option awards – would contravene the plain language of the Equity Incentive Plan.

### c.      S.E.C. Rule 701 and Mutual Mistake

Evalueserve also contends that "issuing the options to Gupta and [] Kumar complied with the contract," because (1) pursuant to the Equity Incentive Plan, Mindspirit was only eligible for options as a "consultant"; and (2) "to qualify for an option, a consultant needed to comply with S.E.C. Rule 701" – an exemption to the rule barring the sale of unregistered securities, which only applies to consultants who are natural persons. (Def. Br. (Dkt. No. 87) at 19-21) Evalueserve proposes that, "[i]n the alternative[,] the Court could reform the contract to substitute Gupta and [] Kumar for Mindspirit based on mutual mistake," because issuing options to Mindspirit as a consultant was impossible to perform under applicable law. (Id. at 22 n.12

(citing Simkin v. Blank, 19 N.Y.3d 46, 52-53 (2012) ("[Contracts may be] set aside or reformed [where] a mutual mistake rendered a portion of the agreement impossible to perform.")); see also id. at 20-21 ("Gupta and A. Kumar . . . are the only natural persons associated with Mindspirit who provided bona fide consulting services."))

Section 5 of the Securities Act "makes it unlawful, directly or indirectly, to publicly offer or sell unregistered stock," S.E.C. v. Sourlis, 851 F.3d 139, 143 (2d Cir. 2016) (citing 15 U.S.C. § 77e), and it is undisputed that Evalueserve has never registered its securities with the S.E.C. (Pltf. Resp. to Def. R. 56.1 (Dkt. No. 86) ¶ 266) Under S.E.C. Rule 701, however, unregistered securities – including stock options – may be issued to a "consultant" as long as the consultant is a natural person. See 17 C.F.R. § 230.701(c); 15 U.S.C. § 77b(a)(1) (defining "security" to include "any . . . option, or privilege on any security").

Read together, the plain language of the Grant Notice, Stock Option Agreement, and Equity Incentive Plan provides that Mindspirit could only receive options as a "consultant," as that term is defined in the Equity Incentive Plan. The Grant Notice provides that it "is subject to all of the terms and conditions as set forth . . . in the Stock Option Agreement . . . , [and] the [Equity Incentive] Plan." (Grant Notice (Dkt. No. 86-3) at 2) The Stock Option Agreement provides that it "is subject to all the provisions of the [Equity Incentive] Plan, the provisions of which are hereby made a part of your Option." (Stock Option Agreement (Dkt. No. 86-3) at 5) The Stock Option Agreement further provides that, "[i]n the event of any conflict between the provisions of your Option and those of the [Equity Incentive] Plan, the provisions of the [Equity Incentive] Plan shall control." (Id.) The Equity Incentive Plan, in turn, limits eligibility for options to employees, directors, and consultants. (See Equity Incentive Plan (Dkt. No. 86-3) at 9 ("The persons eligible to receive Option Awards are the Employees and Directors of and

Consultants to the Company and its Affiliates."); id. at 14 ("Nonstatutory Stock Options may be granted to Employees, Directors and Consultants.")) Mindspirit was neither an employee of, nor a director of, Evalueserve or one of its affiliates. Accordingly, under the Equity Incentive Plan, Mindspirit could only receive options as a consultant.

That does not mean, however, that Mindspirit had to comply with S.E.C. Rule 701 to receive options under the Equity Incentive Plan. Section 5(d)(i) of the Equity Incentive Plan provides that,

> [prior to the date on which a registration statement under the Securities Act relating to the Common Stock is declared effective by the S.E.C.], a Consultant shall not be eligible for the grant of an Option Award if, at the time of grant, either the offer or the sale of the Company's securities to such Consultant is not exempt under Rule 701 because of the nature of the services that the Consultant is providing to the Company, or because the Consultant is not a natural person, or as otherwise provided by Rule 701, <u>unless</u> the Company determines that such grant need not comply with the requirements of Rule 701 and will satisfy another exemption under the Securities Act as well as comply with the securities laws of all other relevant jurisdictions.

(<u>Id.</u> at 15 (emphasis added))

When Evalueserve issued 180,000 shares of unregistered common stock to Mindspirit in 2002 (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 136), it determined that the issuance was permitted under Securities Act Regulation D, 17 C.F.R. § 230.506, because Mindspirit was an accredited investor. (Gangwani Dep. (Dkt. No. 86-8) at 126-27 ("Q. Okay. Did ... you understand that Evalueserve issued shares to Mindspirit? A. Yes. Q. Do you understand that Evalueserve issued shares to Mindspirit without registering with the Securities and Exchange Commission on the ground that Mindspirit is an accredited investor? A. I would assume so.")) Under Section 5(d)(i) of the Equity Incentive Plan, Evalueserve could have issued options to Mindspirit under this same exemption. See 15 U.S.C. § 77b(a)(1) (defining "security" to include "any ... option, or privilege on any security"); S.E.C. Form D, "Notice of Exempt

Offering of Securities," https://www.sec.gov/files/formd.pdf, at 2 (permitting issuer to claim a Regulation D exemption for a "Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Another Security").

Evalueserve contends that it did not have a "duty to pursue [] a determination" as to whether Mindspirit satisfied a securities law exemption other than S.E.C. Rule 701. (Def. Br. (Dkt. No. 87) at 20 n.10) As discussed above, however, the record indicates that Evalueserve determined that the accredited investor exemption applied to Mindspirit. It is therefore irrelevant whether Evalueserve had a "duty to pursue such a determination." (Id.)

Furthermore, under "the implied covenant of good faith and fair dealing that inheres in every contract," Evalueserve had an obligation to determine whether Mindspirit was entitled to receive options. See Travellers Int'l, A.G. v. Trans World Airlines, 41 F.3d 1570, 1575 (2d Cir. 1994) ("Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith."); 1-10 Indus. Assocs., LLC v. Trim Corp. of Am., 297 A.D.2d 630, 631 (2d Dep't 2002) ("[A]lthough the letter agreement did not contain a provision requiring [tenant] to act reasonably in approving or rejecting proposed relocation sites, [tenant] had an implied obligation to exercise good faith in reaching its determination.").

The cases cited by Evalueserve (see Def. Br. (Dkt. No. 87) at 20 n.10), are not to the contrary, because they involve a plaintiff's failure to obtain approvals from third-parties, not a defendant's refusal to make a discretionary determination. See Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 695 (1995) (defendant not required to perform where plaintiff failed to obtain written landlord consent); Merritt Hill Vineyards v. Windy Hgts. Vineyard, 61 N.Y.2d 106, 108 (1984) (defendant not required to perform where plaintiff did not

34

obtain confirmation from Farmers Home Administration that certain mortgages were in place and that the proposed sale did not constitute a default).

Evalueserve also argues that the language "another exemption under the Securities Act" in Section 5(d)(i) of the Equity Incentive Plan must "mean only another exception applicable to a consultant" (Def. Br. (Dkt. No. 87) at 19), but Evalueserve has offered no textual basis for inserting that restriction into the parties' agreement.

For these reasons, it was not inconsistent with Section 5(d)(i) of the Equity Incentive Plan for Evalueserve to issue options to Mindspirit. Nor was it impossible for Evalueserve to do so.[8] Accordingly, Evalueserve is not entitled to summary judgment on the basis that mutual mistake rendered a portion of the Agreement impossible to perform.

### d. The Parties' Intent and Course of Conduct

Evalueserve argues that the Court should interpret the Grant Notice "to provide for issuance to Gupta and [] Kumar," because that interpretation is "consistent with [the parties'] intent" and "Mindspirit's course of conduct." (Def. Br. (Dkt. No. 87) at 20-21) As discussed above, however, this Court may not consider extrinsic evidence "unless the [Agreement] itself is ambiguous." Summit Health, 993 F. Supp. 2d at 390 (internal quotation marks and citations omitted). And "[w]hen a contract is ambiguous . . . , the proper interpretation of the disputed language [is generally] a question of fact for the jury." Id. at 391. To the extent that a contract is ambiguous, "the court may resolve ambiguity . . . as a matter of law [only] if the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could

---

[8] Evalueserve agreed to award options to corporate entities other than Mindspirit. Aggarwal testified that Evalueserve issued options to a corporate entity based in Croton-on-Hudson, New York that "helped [Evalueserve] create an investment plan . . . in the 2001-2002 time frame." (Aggarwal Dep. (Dkt. No. 88-54) at 262-63)

decide to the contrary." <u>Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.</u>, 232 F.3d 153, 158 (2d Cir. 2000).

Here, even if the Agreement were ambiguous as to the "parties receiving the options" – and it is not – the Court could not adopt Evalueserve's interpretation as a matter of law, because there is ample evidence that both Mindspirit and Evalueserve intended that Mindspirit receive the options. (<u>See</u>, <u>e.g.</u>, Aggarwal Dep. (Dkt. No. 88-54) at 58 ("Q. As of February 2001, was it your expectation that Mr. Gupta and Mr. Kumar would receive options in Evalueserve or that the entity Mindspirit would? A. At that time, Mindspirit was."); Vollenweider Dep. (Dkt. No. 88-62) at 90-91 (testifying that he understood that "the investment, if any, in Evalueserve would come from Mindspirit"; that, "to the extent [Evalueserve's] agreement with Mr. Kumar and Mr. Gupta w[as] formalized, [] the entity with whom it would be [formalized] would be Mindspirit"; that the shares would be given to Mindspirit; and that the options would be given to Mindspirit); <u>id.</u> at 145 (testifying that, when he signed the Grant Notice, Evalueserve "considered it to be a valid commitment by Evalueserve to Mindspirit . . . to grant them the stock options, . . ."); Kumar Dep. (Dkt. No. 88-90) at 47 (testifying that he believed Evalueserve would provide "shares and [] stock options to Mindspirit"))

In sum, the Court finds that Evalueserve unambiguously agreed to provide options to Mindspirit.

## 2. **Conditions Precedent**

Evalueserve next argues that the execution of the Grant Notice and Stock Option Agreement was only "the first step in a multi-step process," and that "[t]he actual issuance [of options] needed both a board resolution and [] approval [from the Bermuda Monetary Authority]." (Def. Br. (Dkt. No. 87) at 13) Mindspirit responds that neither board approval nor

approval from the BMA was a condition precedent to Evalueserve's issuance of the options to Mindspirit. (Pltf. Opp. (Dkt. No. 85) at 19-22)

### a. Board Approval as a Condition Precedent

Evalueserve's argument that a board resolution was required before it could issue options to Mindspirit is baseless. Board approval had already been granted. It is undisputed that the Equity Incentive Plan had been approved by the Evalueserve board prior to Vollenweider's execution of the Grant Notice and Stock Option Agreement (Equity Incentive Plan (Dkt. No. 86-3) at 9; Grant Notice (Dkt. No. 86-3) at 2; Stock Option Agreement (Dkt. No. 86-3) at 6), and Vollenweider was Evalueserve's chief executive and a member of its board at the time that he signed these documents. Vollenweider also testified that he had the authority to sign contracts on Evalueserve's behalf. (Vollenweider Dep. (Dkt. No. 88-62) at 248-49) Accordingly, Vollenweider had actual – or at least apparent – authority to obligate Evalueserve to issue options to Mindspirit.[9] See Goldston v. Bandwidth Tech. Corp., 52 A.D.3d 360, 362 (1st Dep't 2008) ("[A]n agreement entered into within the exercise of a corporate officer's apparent authority is binding on the corporation without regard to the officer's lack of actual authority. Even in the instance where a chief executive's actual authority to enter into a particular agreement without the approval of the board is in doubt, no obligation is imposed on the other party to the transaction to show that the president did, in fact, consult the board.") (internal quotation marks and citations omitted).

---

[9] Moreover, Aggarwal testified that the issuance of a grant notice was often the last step, and not the first step, in Evalueserve's process of issuing options, and that this was true for both option grants to employees and option grants to investors. (See Aggarwal Dep. (Dkt. No. 88-54) at 117-18)

### b.     **BMA Approval as a Condition Precedent**

Evalueserve argues that "[t]he actual issuance [of options] needed . . . BMA

approval in addition to the notice and stock option agreement," because the Bermuda Exchange

Control Regulations of 1973 "insert that condition into every contract to which they apply."

(Def. Br. (Dkt. No. 87) at 13)  Evalueserve contends that these Bermuda regulations apply here,

even though the Grant Notice, Stock Option Agreement, Equity Incentive Plan, and Purchase

Agreement all provide that they are governed by New York law.  (See Pltf. Resp. to Def. R. 56.1

Stmt. (Dkt. No. 86) ¶ 104; Grant Notice (Dkt. No. 86-3) at 2 (incorporating by reference the

Stock Option Agreement and Equity Incentive Plan))  According to Evalueserve, the Bermuda

regulations apply because the "internal affairs doctrine requires the application of Bermuda law

to determine the relationship between Evalueserve and its securities holders." (Def. Br. (Dkt.

No. 87) at 13)

### (1)     **The Internal Affairs Doctrine**

The internal affairs doctrine is a "generally-recognized choice-of-law rule," which

is followed in New York, and which provides that "questions relating to the internal affairs of

corporations are decided in accordance with the law of the place of incorporation." Scottish Air

Int'l, Inc. v. British Caledonian Grp., PLC, 81 F.3d 1224, 1234 (2d Cir. 1996) (citing First Nat'l

City Bank v. Banco Para El Comerico Exterior de Cuba, 462 U.S. 611, 621 (1983)); Zion v.

Kurtz, 50 N.Y.2d 92, 100 (1980)).  The doctrine is predicated on the theory that "'only one State

should have the authority to regulate a corporation's internal affairs . . . because otherwise a

corporation could be faced with conflicting demands.'" In re Refco Inc. Sec. Litig., 826 F. Supp.

2d 478, 501 (S.D.N.Y. 2011) (quoting Edgar v. MITE Corp., 457 U.S. 624, 645 (1982)).

A company's internal affairs include "'matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders.'" Id. (quoting Edgar, 457 U.S. at 645); see also Tyco Int'l, Ltd. v. Kozlowski, 756 F. Supp. 2d 553, 560 (S.D.N.Y. 2010) ("The internal affairs doctrine posits that a state has an interest in applying its laws uniformly to issues relating to the organic structure or internal administration of a corporation incorporated in that state.") (internal quotation marks and citations omitted); FIA Leveraged Fund Ltd. v. Grant Thornton LLP, 150 A.D.3d 492, 497 (1st Dep't 2017) ("Internal affairs are matters of corporate governance.").

"'Different conflicts principles apply, however, where the rights of third parties external to the corporation are at issue.'" Roselink Inv'rs, L.L.C. v. Shenkman, 386 F. Supp. 2d 209, 225 (S.D.N.Y. 2004) (quoting First Nat'l City Bank, 462 U.S. at 621) (emphasis in original). For example, the "making of a contract or the commission of a tort" does not implicate the internal affairs doctrine, because these issues "can practicably be decided differently in different states." Tyco, 756 F. Supp. 2d at 560; see also Roselink Inv'rs, 386 F. Supp. 2d at 225 ("Creditors' claims at issue here are tort claims regarding the rights of 'third parties external to the corporation' as they are not brought by shareholders, officers or directors, nor are they brought derivatively on behalf of the corporation. Therefore, the 'internal affairs doctrine' is inapplicable here."); New Greenwich Litig. Tr., LLC v. Citco Fund Servs. (Europe) B.V., 145 A.D.3d 16, 22 (1st Dep't 2016) ("[The] internal affairs doctrine 'does not apply where the rights of third parties external to the corporation are at issue, e.g., contracts and torts.'") (quoting QVT Fund LP v. Eurohypo Capital Funding LLC I, No. CIV.A. 5881-VCP, 2011 WL 2672092, at *7 (Del. Ch. July 8, 2011)).

Here, Mindspirit's breach of contract claim does not fall within the purview of the internal affairs doctrine, because it does not implicate "'the relationships inter se of the corporation, its directors, officers and shareholders.'" In re ICP Strategic Credit Income Fund Ltd., 568 B.R. 596, 609 (S.D.N.Y. 2017) (quoting New Greenwich Litig. Tr., 145 A.D.3d at 22)). Although the internal affairs doctrine may apply in "stockholders' actions challenging the power of the corporation under the law of the state where the corporation was chartered to grant options," it does not apply in "a simple contract suit" between the corporation and a recipient of an option award. Raybuck v. USX, Inc., 961 F.2d 484, 487 (4th Cir. 1992); see also Lewitton v. ITA Software, Inc., No. 07 C 4210, 2008 WL 4427512, at *3 n.4 (N.D. Ill. Sept. 29, 2008) ("[Defendant's] contention that any agreement concerning a grant of options to purchase shares of stock in a Delaware corporation is governed by Delaware law overstates the scope of the internal affairs doctrine on which [the] contention is based.") (citing, inter alia, Raybuck, 961 F.3d at 487) (internal quotation marks omitted), aff'd, 585 F.3d 377 (7th Cir. 2009). Here, Mindspirit's breach of contract claim concerns "the rights of [a] third part[y] external to the corporation," and "is not brought by shareholders, officers, or directors, nor . . . brought derivatively on behalf of the corporation." Roselink Inv'rs, 386 F. Supp. 2d at 225. Accordingly, the "internal affairs doctrine is inapplicable here." Id.

Evalueserve argues, however, that its internal affairs are implicated, because "the contract at issue, providing for the issuance of options and thus creating a potential insider, is not considered a contract with outside third parties." (Def. Reply (Dkt. No. 80) at 8 n.4) None of the cases Evalueserve cites (see id. at 8 & n.4) supports that proposition, however, because each is a shareholder derivative action or its functional equivalent. See, e.g., Hausman v. Buckley, 299 F.2d 696, 700, 702-03 (2d Cir. 1962) (holding that, under internal affairs doctrine, district

court properly applied Venezuelan law in determining the right of stockholders of Venezuelan corporation to bring derivative action); Rosenfeld v. Schwitzer Corp., 251 F. Supp. 758, 761 (S.D.N.Y. 1966) ("Though there is some dispute as to the applicable law determining who is a shareholder . . . , in my view the matter of standing to prosecute a derivative or representative action for violation of state law governing corporate affairs concerns the very nature and quality of (a shareholder's) substantive rights, power and privileges. Thus the question properly should be determined by the law of the interested state, that is to say, the state of incorporation.") (internal quotation marks and citations omitted); Greenspun v. Lindley, 36 N.Y.2d 473, 476-77 (1975) (case involved "holders of beneficial shares of interest in [] real estate investment trust who desire[d] to challenge investment decisions of the trustees and the payment by them of what are alleged to be excessive management fees"; concluding that case was "the equivalent of a shareholders' derivative action," and that because the trust was "organized and existing under the laws of Massachusetts," and "[t]he declaration of trust . . . expressly provide[d] that the law of Massachusetts" would apply, Massachusetts law governed); Levin v. Kozlowski, 45 A.D.3d 387, 388-89 (1st Dep't 2007) (concluding – in a "shareholder derivative action against nominal defendant Tyco International Ltd. and various Tyco officers and directors" – that "the law of Bermuda, where Tyco was incorporated, [wa]s applicable since the question of corporate governance [wa]s at issue"); Hart v. Gen. Motors Corp., 129 A.D.2d 179, 185 (1st Dep't 1987) (concluding that trial court erred in denying motion to dismiss a shareholders' derivative action on forum non conveniens grounds because, inter alia, Delaware – the state of defendant's incorporation – had "an interest superior to that of all other States in deciding issues concerning directors' conduct of the internal affairs of corporations chartered under Delaware law"); Imaging Holdings I, LP v. Israel Aerospace Indus. Ltd., 26 Misc. 3d 1226(A) (Sup. Ct. N.Y. Cty.

2009) (investment vehicles for a group of funds that were shareholders and debtholders in ImageSat – a Netherlands Antilles corporation – brought suit against controlling shareholders of ImageSat and certain of ImageSat's directors alleging, inter alia, breach of fiduciary duty and self-dealing; in granting motion to dismiss on forum non conveniens grounds, court concluded that the "claims relating to the internal affairs of ImageSat," such as the claims for breach of fiduciary duty and self-dealing, "w[ould] likely be governed by the law of the Netherlands Antilles").

In sum, the internal affairs doctrine is not applicable to Mindspirit's claim that Evalueserve breached a contract to provide options.

### (2)    New York's General Choice of Law Rules

Evalueserve argues, in the alternative, that Mindspirit's breach of contract claim is subject to Bermuda law under New York's general choice of law principles, because "there is no evidence in the record of Evalueserve contact with New York since 2005." (Def. Reply (Dkt. No. 80) at 9)

"For contract claims in New York, the 'center of gravity' test, traditionally known as the 'situs' rule, makes use of five factors to determine which of two or more jurisdictions has the 'most significant relationship' or 'contacts' to a given contract dispute." Zuckerman v. Metro. Museum of Art, 307 F. Supp. 3d 304, 324 (S.D.N.Y. 2018) (citing Md. Cas. Co. v. Cont'l Cas. Co., 332 F.3d 145, 151–52 (2d Cir. 2003)). These factors include: "(1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile or place of business of the contracting parties." Id. The New York Court of Appeals has held, however, that "a New York choice-of-law clause in a contract . . . demonstrates the parties' intent that courts not conduct a

42

conflict of laws analysis," and "obviates the application of both common-law conflict-of-laws principles and statutory choice-of-law directives. . . ." Ministers & Missionaries Benefit Bd. v. Snow, 26 N.Y.3d 466, 468 (2015); see also Certain Underwriters at Lloyd's v. New Dominion, LLC, No. 16 CV 5005 DLC, 2016 WL 4688866, at *4 (S.D.N.Y. Sept. 7, 2016) ("A choice of law provision serves as a 'substitute for the conflict-of-laws analysis that otherwise would determine what law to apply.'") (quoting Ministers, 26 N.Y.3d at 468). The Court of Appeals ruling was designed to advance "the primary purpose of including a choice-of-law provision in a contract – namely, to avoid a conflict-of-laws analysis and its associated time and expense." Ministers, 26 N.Y.3d at 475.

Here, the Grant Notice, Stock Option Agreement, Equity Incentive Plan, and Purchase Agreement all provide for the application of New York law. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 104; Grant Notice (Dkt. No. 86-3) at 2) Accordingly, Ministers requires the application of New York law.

### (3)    Public Policy Exception

Notwithstanding Ministers, Evalueserve argues that this Court should apply Bermuda law, because "Bermuda clearly has an interest 'materially greater' than New York's in regulating the existence vel non of securities in Bermuda's corporations, especially when the defendant is a Bermuda corporation and the plaintiff as well as both of its members are foreign to New York." (Def. Reply (Dkt. No. 80) at 8 (internal citation omitted))

As an initial matter, Evalueserve waived this argument, because it did not raise it until its reply brief. See United States v. Jones, No. 15-CR-153 (VSB), 2018 WL 3599730, at *6

n.8 (S.D.N.Y. July 27, 2018) ("It is well-established that arguments must be made in a party's moving brief, not in a reply brief."). The argument is rejected on this basis.

Even if this Court were to reach this argument, it is foreclosed by <u>Ministers</u>. The language of <u>Ministers</u> is unequivocal and brooks no exceptions: "a New York choice-of-law clause in a contract . . . demonstrates the parties' intent that courts not conduct a conflict of laws analysis," and "obviates the application of both common-law conflict-of-laws principles and statutory choice-of-law directives. . . ." <u>Ministers</u>, 26 N.Y.3d at 468.

In <u>Integra Optics, Inc. v. Messina</u>, 52 Misc. 3d 1210(A), 41 N.Y.S.3d 719 (Sup. Ct. Albany Cty. 2016), the court read <u>Ministers</u> to preclude the argument Evalueserve makes here. The defendants in that case argued that – despite a New York choice of law provision – California law should apply, because (1) the non-compete clause at issue – while likely enforceable under New York law – "should be deemed void under the laws of California"; and (2) the defendant company "is . . . California-based . . . with almost all of its employees located in California, and [plaintiff] was hired with the understanding that he would relocate to California and work out of [defendant's] headquarters." <u>Id.</u> at *5. In rejecting the argument that California law should be applied because California had a much greater interest than New York, and enforcement of the non-compete clause would be repugnant to California, the court held that – in light of <u>Ministers</u> – litigants "cannot credibly claim that the application of New York law by a New York court would violate New York's public policy." <u>Id.</u> (internal quotation marks and citations omitted).

Finally, even if this Court could properly consider whether the application of New York law here would violate "some fundamental principle of [Bermuda] justice," some "prevalent conception of good morals," or "some deep-rooted tradition of the common weal,"

Brown & Brown, Inc. v. Johnson, 25 N.Y.3d 364, 368 (2015), Evalueserve has made no such

showing. To the contrary, Evalueserve merely argues, in a conclusory fashion, that Bermuda's

interest in regulating the existence vel non of a Bermuda corporation's securities is materially

greater than any interest New York may have here. (Def. Reply (Dkt. No. 80) at 8) Even under

pre-Ministers law, this argument is not sufficient for Evalueserve to sustain its "heavy burden of

proving that the application of the chosen law would be offensive to a fundamental public policy

[of Bermuda]." Brown & Brown, 25 N.Y.3d at 369.

   Accordingly, the Court concludes that Bermuda Exchange Control Regulations

need not be applied here.

*  *  *  *

   In any event, even if this Court were required to apply the Bermuda Exchange

Control Regulations, it is not clear as a matter of law that – under these regulations –

Evalueserve's options grant required the approval of the Bermuda Monetary Authority.

   Part IV of the Bermuda Exchange Control Regulations of 1973, Section 12(1)

provides that, "[e]xcept with the permission of the [BMA], no person shall in Bermuda issue any

security or, whether in Bermuda or elsewhere, issue any security which is registered or to be

registered in Bermuda, [to a non-resident of Bermuda]." (Bermuda Exchange Control

Regulations (Dkt. No. 84-2) at 11) Part VII, Section 39(1) of the regulations provides that,

> [i]t shall be an implied condition in any contract that, where by virtue of these
> Regulations, the permission or consent of the [Bermuda Monetary Authority] is at
> the time of the contract required for the performance of any term thereof, the term
> shall not be performed except in so far as the permission or consent is given or is
> not required:
>
> Provided that this paragraph shall not apply in so far as it is shown to be
> inconsistent with the intention of the parties that it should apply, whether by
> reason of their having contemplated performance of that term in despite of these
> Regulations or for any other reason.

(Id. at 24)

Here, the record contains substantial evidence demonstrating that Mindspirit and Evalueserve intended that Mindspirit receive the options, notwithstanding the Bermuda regulations. As discussed above, the Grant Notice and Stock Option Agreement unambiguously provide that Evalueserve grants the options to Mindspirit, and no reference to the permission or consent of the Bermuda Monetary Authority appears in the Grant Notice, the Stock Option Agreement, or the Equity Incentive Plan. Moreover, Vollenweider – Evalueserve's chief executive officer when he signed the Grant Notice – testified that he "considered [the Grant Notice] to be a valid commitment by Evalueserve to Mindspirit . . . to grant them the stock options." (Vollenweider Dep. (Dkt. No. 88-62) at 145) Accordingly, a reasonable jury could find that the parties "contemplated performance . . . in despite of [the Bermuda Exchange Control Regulations]," and that Part VII, Section 39(1) of the Bermuda regulations does not insert an implied condition into the Agreement. (Bermuda Exchange Control Regulations (Dkt. No. 84-2) at 24)

### c. Whether Approval by the BMA Is an Express Condition

Evalueserve also argues that, pursuant to Section 2.5 and Schedule B of the Purchase Agreement, the parties expressly agreed that Evalueserve's issuance of options to Mindspirit would be conditioned on approval by the Bermuda Monetary Authority. (Def. Br. (Dkt. No. 87) at 12) Schedule B to the Purchase Agreement provides that "[t]he consent of the Bermuda Monetary Authority must be procured for the issuance of . . . the Option to the Investor." (Purchase Agreement (Dkt. No. 86-5) at 12) This Court cannot resolve as a matter of law whether Schedule B to the Purchase Agreement is incorporated into the Agreement, however.

46

The Grant Notice contains a merger clause providing that, "as of the Date of Grant, this Grant Notice, the Stock Option Agreement[,] and the [Equity Incentive] Plan set forth the entire understanding between [Mindspirit] and [Evalueserve] regarding the acquisition of stock in [Evalueserve]." (Grant Notice (Dkt. No. 86-3) at 2) The only reference to the Purchase Agreement in these three documents appears in Section 9 of the Stock Option Agreement. That provision incorporates by reference Sections 4, 5, and 6 of the Purchase Agreement (Stock Option Agreement (Dkt. No. 86-3) at 5), which relate to "Restrictions on Voluntary Transfer of Shares," "Involuntary Transfers," and "Failure to Deliver Stock," respectively. (Purchase Agreement (Dkt. No. 86-5) at 5-7) None of these Purchase Agreement provisions reference the BMA. (See id. at 5-7)

Under New York law, "where a written agreement includes a [merger] clause," it generally mandates "the full application of the parol evidence rule," Eastman Kodak Co. v. Asia Optical Co., No. 11 CIV. 6036 DLC, 2012 WL 917393, at *4 (S.D.N.Y. Mar. 16, 2012) (internal quotation marks and citations omitted), which "bars admission of extrinsic evidence to vary or contradict the terms of a fully integrated writing," and "applies to both oral and written evidence alike." Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 69 (2d Cir. 2008) (citations omitted).

"The situation is different," however, "when agreements are entered into contemporaneously and are substantially related." Callen v. Callen, No. 53066/2003, 2002 WL 32179000, at *6 (N.Y. Civ. Ct. July 14, 2003). This is because, "[u]nder New York law, all writings forming part of a single transaction are to be read together." This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998). "[W]hether multiple writings should be construed as one agreement depends upon the intent of the parties, an issue which is typically a question of fact

47

for the jury." TVT Records v. Island Def Jam Music Grp., 412 F.3d 82, 89 (2d Cir. 2005) (internal quotation marks and citations omitted). Where "the documents in question reflect no ambiguity as to whether they should be read as a single contract," however, "the question is a matter of law for the court." Id.

Here, the Grant Notice, Stock Option Agreement, and Equity Incentive Plan do not unambiguously convey that they should be read together with the entire Purchase Agreement as a single contract. Id. Where, as here, a document "incorporates by reference certain provisions of another [document], that reference does not alone demonstrate the parties' intent to incorporate other terms not expressly referenced." Norcast S.ar.l. v. Castle Harlan, Inc., Case No. 12 CIV. 4973 PAC, 2014 WL 43492, at *5 (S.D.N.Y. Jan. 6, 2014) (citations omitted). To the contrary, "for the terms of a separate [writing] to be incorporated by reference, it must be clear that the parties knew of and consented to the terms to be incorporated by reference." Id. (internal quotation marks and citation omitted). The Stock Option Agreement's incorporation of three sections of the Purchase Agreement does not clearly manifest an intent to incorporate the entire Purchase Agreement by reference. Accordingly, the Court cannot conclude, as a matter of law, that the Grant Notice, Stock Option Agreement, and Equity Incentive Plan should be read together with the entire Purchase Agreement. TVT Records, 412 F.3d at 89.

There is a genuine issue of material fact as to whether these documents are "part of a single transaction" that must "be read together." This Is Me, 157 F.3d at 139. That question turns on "the intent of the parties," TVT Records, 412 F.3d and 89, and a reasonable jury could find that these documents were "entered into contemporaneously" and "are substantially related." Callen, 2002 WL 32179000, at *6. The four documents at issue are clearly related, because they all concern Mindspirit's receipt of 480,000 Evalueserve stock options. A jury could also find

that these documents were entered into contemporaneously, because all four documents were executed by Evalueserve and sent to Mindspirit – in care of Gupta – on April 20, 2001 (see Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 82) ¶ 3; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 87), after which Gupta retained the documents in Mindspirit's files, never objected to them (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 89), and caused Rosewood to pay $100,000 to Evalueserve on Mindspirit's behalf. (Id. ¶ 120) Because the "expression of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract," Maffea v. Ippolito, 247 A.D.2d 366, 367 (2d Dep't 1998), a jury could infer from these facts that the Agreement encompasses the entire Purchase Agreement.

In sum, there is a genuine issue of material fact regarding whether the parties expressly conditioned the issuance of the Evalueserve options on approval by the Bermuda Monetary Authority.

### d.     Waiver of the Condition of BMA Approval

If a jury were to conclude that Evalueserve's options award is conditioned on consent from the Bermuda Monetary Authority, there is also a genuine issue of material fact as to whether Evalueserve waived that condition precedent.

"Under New York law, a party cannot insist upon a condition precedent, where its non-performance has been caused by himself." Jamil v. Solar Power Inc., No. 16 CIV. 1972 (JSR), 2016 WL 6820725, at *5 (S.D.N.Y. Nov. 8, 2016) (internal quotation marks and citations omitted); see also MBIA Ins. Corp. v. Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Case No. 09 CIV. 10093 RJS, 2011 WL 1197634, at *14 (S.D.N.Y. Mar. 25, 2011) ("It is well established that a party to a contract cannot rely on the failure of another to perform a condition

precedent where [the party itself] has frustrated or prevented the occurrence of the condition.")
(internal quotation marks and citation omitted).[10]

Here, Section 7(b) of the Equity Incentive Plan obligates Evalueserve "to obtain from each regulatory commission or agency having jurisdiction over the Plan such authority as may be required to grant Option Awards. . . ." (Equity Incentive Plan (Dkt. No. 86-3) at 18) Accordingly, even if approval from the BMA is a condition precedent for Evalueserve's issuance of the options to Mindspirit, Evalueserve may have waived that condition by failing to seek that approval.

Evalueserve received a $100,000 investment from Mindspirit on September 20, 2001. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 120) Aggarwal testified that, at some point in late 2001, "after the $100,000 was invested," Gupta told Aggarwal that he had decided that he did not want the options to go to Mindspirit, but that instead the options should go to Gupta and Kumar. (See Aggarwal Dep. (Dkt. No. 88-54) at 121-22 ("[L]ate in 2001 . . . [Gupta] basically said, 'Instead of Mindspirit getting these options, I want to be clear – I want to partition these options to be given to me and to Anil Kumar.' And then I told [Gupta] that, 'You know, the good news is that we have not gone to BMA so far. Just as a matter of clarification, these options are not transferable in general, but since we have not gone to BMA, we can make an exception in this case.'"); id. at 203 ("Q. So to be clear, that decision to put the options in Mr. Gupta's name was done at [Gupta's] behest, not because Evalueserve wanted to do it? A. No. Yes, that's right. Not because Evalueserve wanted it. Q. Because Evalueserve would have been

---

[10] Evalueserve argues that these cases are distinguishable because Evalueserve "cannot waive a condition precedent imposed by law – rather than by the parties, as in the cases relied upon by Mindspirit." (Def. Reply (Dkt. No. 80) at 11) Evalueserve has cited no authority in support of this distinction, however.

fine with the options still being in Mindspirit's name? A. At that time, yes, because BMA approval had not been granted."))

Accordingly, when Gupta instructed Aggarwal that the Evalueserve options should go not to Mindspirit, but instead to Gupta and Kumar, Evalueserve had not yet sought approval from the BMA to issue options to Mindspirit. (Id. at 121-22, 203; Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 124) A jury could find that Evalueserve's failure to obtain consent from the BMA for the issuance of options to Mindspirit was caused by Gupta's request that the options not be issued to Mindspirit, but instead issued to Gupta and Kumar. Acknowledging that Gupta recalls no such conversation (Gupta Dep. (Dkt. No. 88-92) at 99), and that Kumar testified that Gupta never told him about any such conversation (Kumar Dep. (Dkt. No. 88-90) at 78-79), there is nonetheless a material issue of fact as to whether Gupta caused Evalueserve not to seek BMA approval for the issuance of options to Mindspirit.

Accordingly, this Court cannot resolve as a matter of law whether Evalueserve waived the condition of approval from the Bermuda Monetary Authority.

## C.     **Performance by Plaintiff**

Evalueserve concedes that Mindspirit's obligations under "all [of] the April 17[, 2001] Documents" -- the Grant Notice, the Stock Option Agreement, the Equity Incentive Plan, and the Purchase Agreement -- "were . . . performed on Mindspirit's side by Rosewood, Gupta and A. Kumar." (Def. Br. (Dkt. No. 87) at 11) Accordingly, there is no dispute as to Mindspirit's performance under the Agreement.

## D.     **Breach**

Mindspirit contends that Evalueserve breached the Agreement by (1) preventing Mindspirit from exercising the options; (2) transferring the options to Gupta and Kumar; (3)

refusing to transfer the options back to Mindspirit; (4) not permitting Mindspirit to participate in a buy-back program that was offered to all other option-holders; (5) not obtaining Mindspirit's consent when it allegedly modified Mindspirit's option award by transferring the options to Gupta and Kumar, in violation of Section 11(e) of the Equity Incentive Plan; (6) not obtaining regulatory approval from the BMA for issuance of Mindspirit's options; and (7) refusing to permit Mindspirit to be nominated to receive the shares that are the subject of the options. (Pltf. Opp. (Dkt. No. 85) at 27; see also Am. Cmplt. (Dkt. No. 19) ¶¶ 58, 61-70)

Evalueserve responds that "there was no breach of contract," because "issuing the options to Gupta and [] Kumar complied with the contract." (Def. Br. (Dkt. No. 87) at 19-21) As discussed above, however, the Court concludes that the parties agreed in the Agreement that the Evalueserve options grant would be provided to Mindspirit, and not to Gupta and Kumar.

To the extent that Evalueserve argues that there is no breach because Mindspirit ratified the issuance of options to Gupta and Kumar by silence or acquiescence (see id. at 21), that argument cannot be resolved as a matter of law. Under New York law,

> ratification "must be performed with full knowledge of the material facts relating to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts or language. . . . However, the intent can be implied from knowledge of the principal coupled with a failure to timely repudiate, where the party seeking a finding of ratification has in some way relied upon the principal's silence or where the effect of the contract depends upon future events."

Cammeby's Mgmt., Co., LLC v. Affiliated FM Ins. Co., 152 F. Supp. 3d 159, 165 (S.D.N.Y. 2016) (quoting Chemical Bank v. Affiliated FM Ins. Co., 169 F.3d 121, 128 (1999)). "[U]nless the relevant facts are undisputed, the question of ratification is one for the jury." In re Nigeria Charter Flights Contract Litig., 520 F. Supp. 2d 447, 466 (E.D.N.Y. 2007).

Here, Mindspirit's assent to the issuance of options to Gupta and Kumar is not "clearly established," because there is a genuine issue of material fact as to whether either of Mindspirit's members – Rosewood and Malvika Kumar – had full knowledge of the material facts. The parties have not offered any testimony from Malvika Kumar, and Gupta – the only member of Rosewood whose testimony was offered – testified that he believed the options were in Rosewood's name until April 2011, when Evalueserve contacted Gupta and Kumar and told them that they should immediately exercise the options listed in their names for tax reasons. (See Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 82) ¶ 11; Gupta Dep. (Dkt. No. 88-92) at 66-67) Gupta also testified that, as of April 25, 2011 – the date that he sought to exercise the options – it still was not clear to him that the options were in his name. (Pltf. R. to Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 226) Moreover, about a year later – after the BMA rejected Gupta's application to exercise the options – Gupta's accountant wrote in a February 7, 2012 email that he "believe[d] the options [were] still . . . held in the name of Mindspirit, or its owners Rosewood Partners and Malvika Kumar." (March 2, 2012 Gangwani email chain (Dkt. No. 76-19) at 4) Because there is substantial evidence indicating that Gupta did not have full knowledge of the material facts related to the issuance of the options, Evalueserve is not entitled to summary judgment on a ratification theory.

Evalueserve also argues that it did not breach the contract by transferring the options to Gupta and Kumar, by failing to extend the buy-back program to Mindspirit, or by failing to obtain Mindspirit's consent in violation of Section 11(e) of the Equity Incentive Plan, because "there was no issuance of options to Mindspirit." (Def. Br. (Dkt. No. 87) at 25-26) Evalueserve asserts that it "never issued any options to Mindspirit since there was neither any

Evalueserve board resolution authorizing them nor any BMA approval for them either sought or received." (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 124)

As discussed above, however, the Court has concluded that the plain language of the Grant Notice and Stock Option Agreement indicate that Evalueserve granted stock options to Mindspirit, that additional board approval was not required, and that there is a question of fact as to whether the Agreement expressly conditioned the issuance of the options on the consent of the Bermuda Monetary Authority. Accordingly, this Court cannot determine, as a matter of law, that Evalueserve did not breach the contract when it transferred the options to Gupta and Kumar, when it failed to extend the buy-back program to Mindspirit, and when it failed to obtain Mindspirit's consent to modification of the options grant in violation of Section 11(e) of the Equity Incentive Plan.

Evalueserve also argues that its refusal to transfer the options back to Mindspirit did not breach the Agreement, because such a transfer "was prohibited by the terms of the stock options."[11] (Def. Br. (Dkt. No. 87) at 25) Evalueserve maintains that it transferred the Evalueserve options from Mindspirit to Gupta and Kumar, however. In doing so, it necessarily waived the provisions prohibiting transfers.

Finally, Evalueserve contends that it did not breach the contract by failing to seek all necessary regulatory approvals. (Id.) That argument cannot be resolved as a matter of law for the reasons stated above.

---

[11] With respect to the "transferability of a nonstatutory stock option," Section 6(g) of the Equity Incentive Plan provides that "A Nonstatutory Stock Option shall be transferable to the extent provided in the Option Agreement." (Equity Incentive Plan (Dkt. No. 86-3) at 16-17) Under Section 8 of the Stock Option Agreement, the "Option is not transferable." (Stock Option Agreement (Dkt. No. 86-3) at 5)

In sum, there are material issues of fact as to whether Evalueserve breached the Agreement. Accordingly, Evalueserve is not entitled to summary judgment on the ground that there was no breach of contract.

### E. Illegality

In response to Mindspirit's breach of contract claim, Evalueserve has raised the affirmative defense of illegality. The parties have cross-moved for summary judgment on Evalueserve's illegality defense. (See Pltf. Br. (Dkt. No. 74) at 5; Def. Br. (Dkt. No. 87) at 22-25) According to Evalueserve, any issuance of options to Mindspirit would violate federal securities laws, because Section 5 of the Securities Act of 1933 bars the sale of unregistered securities, and it is undisputed that Evalueserve has never registered with the S.E.C. (Def. Br. (Dkt. No. 87) at 22-25; Pltf. Resp. to Def. R. 56.1 (Dkt. No. 86) ¶ 266) According to Mindspirit, however, Evalueserve's illegality defense fails because, inter alia, "[f]ederal securities laws bar the issuance of unregistered securities only when the issuance constitutes a 'public offering,'" and "Evalueserve explicitly waived its right to argue that the issuance constituted a 'public offering' at a court conference in which it refused to provide discovery regarding its offering." (Pltf. Br. (Dkt. No. 74) at 5)

"Section 5 of the Securities Act makes it unlawful, directly or indirectly, to publicly offer or sell unregistered stock, see 15 U.S.C. § 77e, unless the offering is covered by an exemption." Sourlis, 851 F.3d at 143. Under "Section 4(2) of the Securities Act," Section 5's "registration requirement 'shall not apply to . . . transactions by an issuer not involving any public offering.'"[12] Anegada Master Fund, Ltd. v. PXRE Grp. Ltd., 680 F. Supp. 2d 616, 621

---

[12] Sections 5 and 4(2) of the Act apply to options. See 15 U.S.C. § 77b(a)(1) (defining "security" to include "any . . . option, or privilege on any security").

(S.D.N.Y. 2010) (quoting 15 U.S.C. § 77d(a)(2)).  The applicability of this exemption turns on "'whether the particular class of persons affected needs the protection of the Securities Act,'" because "[a]n offering to those who are shown to be able to fend for themselves is a transaction 'not involving a public offering.'" Id. (quoting S.E.C. v. Ralston Purnia Co., 346 U.S. 119, 125 (1953)).  "Factors commonly considered in determining whether an offering is public include: '(1) the number of offerees; (2) the sophistication and experience of the offerees; (3) the nature and kind of information which has been provided; [and] (4) the size of the offering and the precautions taken to prevent the offerees from reselling their securities.'" Feldman v. Concord Equity Partners, LLC, No. 08-CV-4409 (CS), 2010 WL 1993831, at *3 (S.D.N.Y. May 19, 2010) (quoting Steed Fin. LDC v. Nomura Sec. Int'l, Inc., No. 00 CIV. 8058 (NRB), 2001 WL 1111508, at *5 (S.D.N.Y. Sept. 20, 2001)).

Here, when Mindspirit sought discovery relevant to these factors, Evalueserve objected, and Mindspirit moved to compel. (See Joint Ltr. (Dkt. No. 58-1) at 2-4)  During oral argument on the motion to compel, Evalueserve represented that it would not argue that there was a public offering, and Magistrate Judge Henry Pitman denied Mindspirit's motion to compel on that basis. (See March 1, 2017 Order (Dkt. No. 60) at 2 ("Plaintiff[']s application to compel production of additional documents regarding defendant's illegality defense is denied. I note in this regard that defendant has represented, on the record, that it will not argue that its issuance of the disputed options [was] part of a public offering."))  Accordingly, Evalueserve cannot argue that the issuance of options to Mindspirit constitutes a public offering, and its illegality defense has been waived.

Evalueserve argues that the public offering exception is "irrelevant," because the Agreement requires that any "issuance of options . . . comply with [S.E.C. Rule 701]." (Def. Br.

(Dkt. No. 87) at 24-25)  As discussed above, however, the Court has rejected the argument that the parties agreed that Mindspirit could only receive options pursuant to Rule 701.

Rule 701 does not preclude the application of other exemptions.  Preliminary Note 3 to Rule 701 provides that "[a]n issuer that attempts to comply with this section, but fails to do so, may claim any other exemption that is available," 17 C.F.R. § 230.701 Preliminary Note 3, and Evalueserve admits that "Rule 701 is irrelevant if 'the company determines that such grant need not comply with the requirements of Rule 701 and will satisfy another exemption under the Securities Act.'" (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 82) ¶ 23)

Mindspirit's motion for summary judgment on Evalueserve's illegality defense will be granted.

## F.  <u>Statute of Limitations</u>

Evalueserve claims that Mindspirit's breach of contract claim is barred by New York's six-year statute of limitations.  (Answer (Dkt. No. 47) at 10)  The parties have cross-moved for summary judgment on Evalueserve's statute of limitations defense.  (Pltf. Mot. (Dkt. No. 73); Def. Mot. (Dkt. No. 78))

Evalueserve argues that the statute of limitations expired seven years before Mindspirit filed this action on August 3, 2015, because "if there was a breach, . . . [t]here is no disputing that [it] happened in 2002," when Evalueserve "reallocated the 480,000 options" to Gupta and Kumar.  (Def. Br. (Dkt. No. 87) at 14; <u>see</u> <u>also</u> <u>id.</u> at 7)  Mindspirit responds that its breach of contract claim is timely because, "[u]nder New York law, the statute of limitations on an option contract does not begin to run until exercise of the option is rejected," and

"Evalueserve did not refuse to honor Mindspirit's exercise of the option until 2012." (Pltf. Opp. (Dkt. No. 85) at 11)

## 1.    The Option Contract Accrual Rule

"The statute of limitations for breach of a contract under New York law is six years." Wiedis v. Dreambuilder Investments, LLC, 268 F. Supp. 3d 457, 470 (S.D.N.Y. 2017) (citing N.Y. C.P.L.R. § 213(2)). "A cause of action for breach of contract ordinarily accrues . . . upon breach," and "[t]he plaintiff need not be aware of the breach or wrong to start the period running." Guilbert v. Gardner, 480 F.3d 140, 149 (2d Cir. 2007) (citing Ely-Cruikshank Co. v. Bank of Montreal, 81 N.Y.2d 399, 402 (1993)). "This is true even when the alleged injury occurs after the breach itself." Wells Fargo Bank, N.A. v. JPMorgan Chase Bank, N.A., No. 12 CIV. 6168 MGC, 2014 WL 1259630, at *2 (S.D.N.Y. Mar. 27, 2014) (citing Ely-Cruikshank Co., 81 N.Y.2d at 402); see also T & N PLC v. Fred S. James & Co. of NY, Inc., 29 F.3d 57, 59 (2d Cir. 1994) ("[T]he [New York] Court of Appeals . . . has declined to adopt the accrual-at-injury rule, even where breach and damages are not simultaneous.").

Where the action is "based on a stock option agreement which provides that plaintiff might exercise the option at any time," however, "the [s]tatute of [l]imitations does not commence to run until the person granted the option demands the [s]tock." Rossi v. Oristian, 50 A.D.2d 44, 46 (4th Dep't 1975); see also 2B Carmody-Wait New York Practice § 13.235 (2d ed. September 2018 update) ("The breach of a stock option contract does not occur . . . until the option holder . . . either tender[s] payment for the stock or demand[s] its issuance."). This is because "[i]t belies common sense to suggest . . . that the [s]tatute of [l]imitations applicable to [an option] contract beg[ins] to run prior to the maturation of the contingency, namely the

58

exercise of the option to buy." Lyons & Assocs., Inc. v. 16 E. 48th St. Corp., 168 Misc. 2d 915, 917 (Sup. Ct. N.Y. Cty. 1996).

Evalueserve concedes "that no court has [] questioned" the option contract accrual rule set forth in Rossi, but argues that its "viability suffers from the holding in Hahn Automotive Warehouse, Inc. v. American Zurich Ins. Co., 18 N.Y.3d 765, 770-71 (2012)." (Def. Reply (Dkt. No. 80) at 12) Hahn is not applicable here, however. The issue in Hahn was whether "insurers' breach of contract []claims began to [accrue] when they possessed the legal right to demand payment from the insured or years later after they issued invoices." Hahn, 18 N.Y.3d at 767. An investor's option to purchase stock is clearly distinguishable from an insurer's right to demand payment from a policy holder, because one of the primary benefits an option holder derives from an option is flexibility in choosing when to exercise the option, while an insurer that waits to demand payment from a policy holder has no similar justification for choosing not to pursue its claim. Accordingly, Hahn does not cast doubt on Rossi's accrual rule.

Evalueserve also argues that Mindspirit "cannot invoke cases applying [] to option contracts," because "Mindspirit had the promise [to provide options] but not the options." (Def. Br. (Dkt. No. 87) at 17) This Court has concluded, however, that under the plain language of the Grant Notice and Stock Option Agreement Evalueserve granted options to Mindspirit.

Evalueserve also contends that "Mindspirit's effort to invoke the option contract cases fails for the elemental reason that it never attempted to exercise options and never demanded shares." (Id. at 18) Mindspirit responds that, "[i]n 2012, Mr. Gupta and Mr. Kumar sought to have the options transferred into Mindspirit's name and Mindspirit sought to exercise the options, but Evalueserve rejected both the transfer and the exercise." (Pltf. R. 56.1 Stmt. (Dkt. No. 76) ¶ 16) In support of that claim, Mindspirit cites the emails exchanged between

59

Deuser – Gupta's accountant – and Evalueserve in early 2012. (See id. (citing March 2, 2012

Gangwani email chain (Dkt. No. 76-19))

In a February 7, 2012 email to Evalueserve, Deuser wrote:

> Prior to moving forward with exercise of the options, I have one outstanding
> concern that hasn't been fully addressed . . . .

> Given that the stock options were originally issued in the name of Mindspirit and
> were not transferable according to article 1.8 of the agreement, I believe the
> options should still be held in the name of Mindspirit, or its owners Rosewood
> Partners and Malvika Kumar.

> Can Evalueserve confirm this is the company's understanding as well? If not,
> would someone be able to provide additional explanation regarding the transfer of
> the options to Mr. Gupta?

(Id. at 3)

Three weeks later – having gotten no answer – Deuser sent another email to

Evalueserve to "follow up on the . . . issue regarding transferring the stock options back (or

reversing the original transfer) into the name of Mindspirit or its owner Rosewood." (Id. at 2)

On March 2, 2012, Gangwani – Evalueserve's chief financial officer – responded: "We cannot

transfer the options to Mindspirit. Also there wasn't any error in assigning the stock options to

Rajat Gupta." (Id.)

Reading these emails in the light most favorable to Mindspirit, a reasonable juror

could find that Mindspirit "demand[ed] [its] [s]tock" in February 2012. Rossi, 50 A.D.2d at 46.

Accordingly, Evalueserve is not entitled to summary judgment on its statute of limitations

defense.

At the same time, Mindspirit is not entitled to summary judgment on

Evalueserve's statute of limitations defense under Rossi, because there is a question of fact as to

whether Mindspirit's option award required the prior consent of the BMA. If the BMA's consent

was a condition precedent to the issuance of the options, then Mindspirit never received options, and <u>Rossi</u> is inapplicable.

## 2.   The Timeliness of Other Alleged Breaches

Mindspirit contends that it "has asserted three other breaches of the option agreement [that] could not possibly have arisen until 2011 at the earliest and, thus, are timely." (Pltf. Br. (Dkt. No. 74) at 9) These three other alleged breaches are: (1) Evalueserve's refusal in 2012 to transfer the options issued in the names of Gupta and Kumar back to Mindspirit; (2) Evalueserve's refusal in 2011 to permit the options issued in the names of Gupta and Kumar to be exercised by Mindspirit as nominee; and (3) Evalueserve's 2013 decision to exclude Mindspirit from a buy-back program offered to all other Evalueserve option-holders. (<u>Id.</u> at 9-10)

Under New York law, a breach of contract claim generally "accrues when the contract is first breached." <u>Almazan v. Almazan</u>, No. 14-CV-311 AJN, 2015 WL 500176, at *9 (S.D.N.Y. Feb. 4, 2015) (citing <u>T & N PLC</u>, 29 F.3d at 59 (2d Cir. 1994) ("[T]he [New York] Court of Appeals . . . has declined to adopt the accrual-at-injury rule, even where breach and damages are not simultaneous.")). "One exception to this rule is made for claims premised on a 'continuing wrong,'" in which case "'each successive breach may begin the statute of limitations running anew.'" <u>Maloul v. New Colombia Res., Inc.</u>, No. 15 CIV. 8710 (KPF), 2017 WL 2992202, at *5 (S.D.N.Y. July 13, 2017) (quoting <u>Guilbert</u>, 480 F.3d at 150). "[T]he 'continuing wrong' exception is narrow," however, and "only 'extend[s] the statute of limitations when [a] contract imposes a continuing duty' that is repeatedly breached." <u>Id.</u> (quoting <u>Henry v. Bank of Am.</u>, 147 A.D.3d 599, 601 (1st Dep't 2017)). "The doctrine distinguishes between 'a single wrong that has continuing effects and a series of independent, distinct wrongs,' and allows an

exception to New York's usual accrual rules only in the latter case." Id. (quoting Henry, 147 A.D.3d at 601)); see also First Am. Title Ins. Co. of New York v. Fiserv Fulfillment Servs., Inc., No. 06 CIV. 7132 (NRB), 2008 WL 3833831, at *3 (S.D.N.Y. Aug. 14, 2008) (when, after an initial breach, "further and substantial damages subsequently accrue[], they [a]re not the result of a new or continuous breach of contract," if they "relate[] back to the original breach which gave the right of action for [] recovery") (internal quotation marks and citation omitted).

Here, Mindspirit argues that "Evalueserve breached its contract with Mindspirit by [] purportedly transferring the options to Gupta and Kumar, . . . [and] failing to obtain Mindspirit's consent . . . when it allegedly modified Mindspirit's Option award by transferring the options to Gupta and Kumar." (See Pltf. Opp. (Dkt. No. 85) at 27)  It is undisputed that the resolution listing Gupta and Kumar as owners of the options, rather than Mindspirit, was adopted by Evalueserve's board in 2002. (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 82) ¶ 4) Accordingly, if Rossi does not apply and Evalueserve breached its agreement with Mindspirit, the "contract [wa]s first breached" in 2002, and Mindspirit's breach of contract claim accrued at that time. Almazan, 2015 WL 500176, at *9.

The three other alleged breaches cited by Mindspirit – the refusal to permit the transfer of options back to Mindspirit; the refusal to permit the options issued in the names of Gupta and Kumar to be exercised by Mindspirit as nominee; and the decision not to offer the buy-back program to Mindspirit – are not "a series of independent, distinct wrongs," but rather result from "a single wrong that has continuing effects." Henry, 147 A.D.3d at 601. Indeed, these alleged breaches all "relate[] back to the original [alleged] breach," which gave Mindspirit "the right of action for [] recovery," Am. Title Ins. Co. of New York, 2008 WL 3833831, at *3, or constitute a failure to cure the breach, rather than the breach itself. See id. at *2 (emphasizing

the "distinction between a breach and the ability to cure a breach"). Accordingly, the "continuing wrong" exception would not render Mindspirit's breach of contract claim timely if Rossi is inapplicable, and Mindspirit is not entitled to summary judgment on Evalueserve's statute of limitations defense.

For these reasons, the parties' cross-motions for summary judgment on Evalueserve's statute of limitations defense will be denied.

## III. THE UNJUST ENRICHMENT CLAIM

Evalueserve has moved for summary judgment on Mindspirit's unjust enrichment claim on the grounds that (1) the parties' contract governing the subject matter of this action bars an unjust enrichment claim; (2) the claim is time-barred; and (3) the claims fails on its merits. (Def. Mot. (Dkt. No. 78)) Mindspirit has cross-moved for summary judgment on Evalueserve's statute of limitations defense. (Pltf. Mot. (Dkt. No. 73))

### A. Duplicative Unjust Enrichment Claims

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc., 448 F.3d 573, 586 (2d Cir. 2006) (internal quotation marks and citations omitted). "It is important to note, however, the nature of an unjust enrichment claim in New York: 'The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement.'" Id. at 586-87 (quoting Goldman v. Metropolitan Life Ins. Co., 5 N.Y.3d 561, 572 (2005)) (emphasis in original); see also Corsello v. Verizon New York, Inc., 18 N.Y.3d 777, 790 (2012) ("An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract [claim.]"). Accordingly, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily

precludes recovery [for unjust enrichment] for events arising out of the same subject matter.'"
Beth Israel Med. Ctr., 448 F.3d at 587 (quoting Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,
70 N.Y.2d 382, 388 (1987)).

　　　　　If at summary judgment the court concludes that the contract at issue is "valid and
enforceable," then "defendants are entitled to summary judgment on the unjust enrichment
claim." Blum v. Spaha Capital Mgmt., LLC, 44 F. Supp. 3d 482, 496 (S.D.N.Y. 2014); see also
Beth Israel Med. Ctr., 448 F.3d at 587 ("It is impermissible . . . to seek damages [on an unjust
enrichment claim] where the suing party has fully performed on a valid written agreement, the
existence of which is undisputed, and the scope of which clearly covers the dispute between the
parties.'") (quoting Clark-Fitzpatrick, 70 N.Y.2d at 388). Even where there is a genuine dispute
about which documents or provisions are incorporated into a contract, an unjust enrichment
claim may still be dismissed as duplicative, because "all that matters" is "that there is at least one
express agreement that governs the contractual relationship . . . ." Design Partners, Inc. v. Five
Star Elec. Corp., No. 12 CV 2949 PKC VMS, 2017 WL 818364, at *8 (E.D.N.Y. Mar. 1, 2017)
("The parties do not dispute that payment for the CADD services rendered by Design Partners is
governed by contract. Whether that contract is the Consulting Agreement, the MSA, the
Purchase Orders, or a combination of all of the foregoing, is irrelevant; that there is at least one
express agreement that governs the contractual relationship is all that matters."); see also
Maryland Cas. Co. v. W.R. Grace & Co., 218 F.3d 204, 212 (2d Cir. 2000) ("The notion of
unjust enrichment applies where there is no contract between the parties[.]"); cf. Oliver Wyman,
Inc. v. Eielson, No. 15 CIV. 5305 (RJS), 2016 WL 5339549, at *12 (S.D.N.Y. Sept. 22, 2016)
(dismissing unjust enrichment claim as duplicative of breach of contract claim where "the parties
[] d[id] not contest that the Asset Purchase Agreement, the Non-Solicitation Agreement, and the

Employment Agreement [we]re enforceable contracts that govern[ed] the subject matter of th[e] dispute," although "[d]efendants dispute[d] the enforceability of certain [] covenants" contained in the agreements).

Here, the parties agree that the Agreement governs Evalueserve's option grant (see Def. R. 56.1 Stmt. (Dkt. No. 88) ¶ 91; Pltf. R. 56.1 Stmt. (Dkt. No. 76) ¶ 3), and there is no dispute that Mindspirit fully performed its obligations under the Agreement. (See Def. Br. (Dkt. No. 87) at 11) Moreover, there is no genuine dispute as to whether the Agreement is valid and enforceable, although there are issues of fact as to whether the parties intended that the entire Purchase Agreement be incorporated into the Agreement.

In denying Evalueserve's Rule 12(b)(6) motion to dismiss Mindspirit's unjust enrichment claim, this Court noted that Evalueserve had "argued that any contractual agreement to award Evalueserve stock options to Mindspirit [wa]s barred both by Evalueserve's Equity Incentive Plan and by federal securities law." (Sept. 26, 2016 Order (Dkt. No. 45) at 18-19 (internal citations omitted)) Accordingly, "the validity or enforceability of the alleged agreement between Evalueserve and Mindspirit under which Mindspirit would receive Evalueserve stock options [wa]s in doubt or uncertain." (Id.)

In this Opinion, however, the Court has ruled that Evalueserve waived its illegality defense, and that Evalueserve's issuance of options to Mindspirit was not barred by the Equity Incentive Plan. Accordingly, both bases for permitting the unjust enrichment claim to proceed no longer exist.

Mindspirit contends that its unjust enrichment claim remains viable, however, because Evalueserve has argued both that the Agreement "should be read as providing options to

Gupta and Kumar [instead of] Mindspirit," and that it "should be reformed." (Pltf. Opp. (Dkt. No. 85) at 28) The Court has rejected both of these arguments, however.

Mindspirit also contends that Evalueserve has argued that the Agreement "was never formed." (Id.) To the extent that Evalueserve has argued that board approval was necessary, this Court has rejected that argument. Evalueserve's remaining arguments concerning the Agreement do not deny its existence, but instead dispute the meaning of certain terms of the Agreement, as well as whether the Agreement contains certain conditions precedent. Accordingly, Mindspirit's unjust enrichment claim is duplicative of its breach of contract claim, and Evalueserve is entitled to summary judgment on the unjust enrichment claim. See Am. Tax Funding, LLC v. City of Syracuse, 41 F. Supp. 3d 188, 195 (N.D.N.Y. 2014) (dismissing unjust enrichment claim where "the existence of valid written contracts, and their application to the subject matter at issue, [could not] be disputed," and the "dispute [] center[ed] on the definition of contract terms").

### B.     Statute of Limitations

Mindspirit's unjust enrichment claim is also time-barred.

"Under New York law, the statute of limitations applicable to an unjust enrichment claim depends on the nature of the substantive remedy plaintiff seeks." Matana v. Merkin, 957 F. Supp. 2d 473, 494 (S.D.N.Y. 2013) (citation omitted). "The limitations period is six years where plaintiff seeks an equitable remedy, but three years where plaintiff seeks monetary damages." Id. Here, Mindspirit seeks both equitable relief and monetary damages. (See Am. Cmplt. (Dkt. No. 19)) Accordingly, this Court must consider both limitations periods.

For either type of relief, the statute begins to run "'upon the occurrence of the wrongful act giving rise to a duty of restitution and not from the time the facts constituting the

fraud are discovered.'" Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 364 (2d Cir. 2013)

(quoting Coombs v. Jervier, 74 A.D.3d 724, 724 (2d Dep't 2010)). "Put another way, 'a claim

for unjust enrichment accrues [] when the enrichment actually becomes unlawful.'" Campione

v. Campione, 942 F. Supp. 2d 279, 284 (E.D.N.Y. 2013) (quoting T.E.A.M. Ent't, Inc. v.

Douglas, 361 F.Supp.2d 362, 370 (S.D.N.Y. 2005)).

  Because an unjust enrichment claim requires the absence of an enforceable

contract, see Beth Israel Med. Ctr., 448 F.3d at 587, the Rossi accrual rule for option contracts

does not apply to unjust enrichment claims. Furthermore, for unjust enrichment claims

predicated on a plaintiff's "purported ownership interest" in a security, the date of accrual is the

date on which the security was not issued as promised, as opposed to the date that the defendant

"actually repudiate[s]" the alleged ownership interest. Elliott v. Qwest Commc'ns Corp., 25

A.D.3d 897, 898 (3d Dep't 2006) (plaintiff made investment in defendant corporation in

exchange for preferred stock; defendant corporation never issued the preferred stock, and

plaintiff brought unjust enrichment claim; court rejected plaintiff's argument that his unjust

enrichment claim accrued when "plaintiff's purported ownership interest was actually

repudiated," holding instead that the claim accrued when defendant failed to issue the preferred

stock as promised). Rather, the claim accrues, "at the latest," when the defendant fails to timely

issue the security to the plaintiff.[13] Id. ("[T]he unjust enrichment claim . . . clearly accrued in

---

[13] The cases cited by Mindspirit (Pltf. Opp. (Dkt. No. 85) at 31), are entirely inapposite and not
to the contrary. See Busher v. Barry, No. 14-CV-4322 (NSR), 2016 WL 1249612, at *2-3, 5
(S.D.N.Y. Mar. 28, 2016) (plaintiff brought shareholder derivative action, alleging, inter alia,
that defendant golf club was unjustly enriched by an unlawful policy restricting the transfer of
shares to non-members; such restrictions were in place from approximately 1967 to 1975, and
then reintroduced in 2009; court held that plaintiff's unjust enrichment claim, which was filed in
2014, was timely under six-year statute of limitations based on evidence that defendant "rejected
lawful demands to transfer shares" after the 2009 reintroduction of the transfer restrictions);
Town of Oyster Bay v. Occidental Chem. Corp., 987 F. Supp. 182, 210 (E.D.N.Y. 1997) (town

1995 (when plaintiff wired the money) or, at the latest, in 1996 (when [defendant] requested additional information and failed to timely issue a stock certificate).").

Here, the wrongful act of which Mindspirit complains is Evalueserve's placing the options for which Mindspirit paid $100,000 in the names of Gupta and Kumar. (See Am. Cmplt. (Dkt. No. 19) ¶ 50 (". . . Evalueserve transferred and reissued [Mindspirit's] stock options [to Kumar and Gupta] unilaterally with[out] notice, consent, or ratification . . . ."); id. ¶ 61 ("Evalueserve . . . unilaterally transferred the 480,000 stock options to Anil Kumar and Rajat Gupta after the Agreement had been signed, in violation [of] the parties' Agreement. Later, Evalueserve falsely claimed to have been contacted by Rajat Gupta years ago and instructed by Mr. Gupta to transfer and reissue the stock options in the individual names of Rajat Gupta and Anil Kumar. Plaintiff[] den[ies] that Rajat Gupta ever made this request and believe[s] Evalueserve's conduct was an effort to conceal Evalueserve's prior and continuing wrongful conduct, even if that meant wholly and illegally depriving [Mindspirit] of [its] rights and property."); id. ¶ 112-13 ("Both legal and equitable obligation[s] existed that were intended in the contract but were not fulfilled by Evalueserve, namely 480,000 stock options Evalueserve has not provided to [Mindspirit] in exchange for [its] investment. . . . As a result, and

---

sought to recover costs arising out of its response to release or threatened release of hazardous substances from a landfill, alleging that defendant corporations had brought hazardous materials to the landfill; court held that unjust enrichment claim accrued in the year when the Environmental Protection Agency "wrote to a number of the defendants to determine whether they would contribute to the remediation effort" and selected the "appropriate remedial action"); Dimatteo v. Cosentino, 71 A.D.3d 1430, 1431 (4th Dep't 2010) (plaintiff granted limited power of attorney to defendant – his sister – with respect to the sale of real property owned by the parties and their brother that was subject to a life estate held by their parents; pursuant to an agreement between the parties, the non-party brother, and their parents, proceeds from the sale were deposited into a checking account in defendant's name, in trust for the use and benefit of the parents; after both parents died, plaintiff demanded payment of his alleged share in the proceeds from the real estate transaction; court held that unjust enrichment claim accrued at the time of that demand).

irrespective of whether the obligation do so or not exists under the contract, Evalueserve has unjustly enriched itself by accepting the investment funds provided by plaintiffs, and by preventing exercise of the stock options. . . .")) It is undisputed that the resolution listing Gupta and Kumar as owners of the options, rather than Mindspirit, was adopted by Evalueserve's board in 2002. (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 82) ¶ 4) Accordingly, the alleged wrongful act giving rise to the duty of restitution occurred in 2002. Because this action was not brought until 2015, Mindspirit's unjust enrichment claim is time-barred. Cohen, 711 F.3d at 364; Elliott, 25 A.D.3d at 898.

## CONCLUSION

For the reasons stated above, Evalueserve's motion for summary judgment is granted as to Mindspirit's unjust enrichment claim, but is otherwise denied. Mindspirit's cross-motion for partial summary judgment is granted as to Evalueserve's illegality defense, but is otherwise denied. The Clerk of Court is directed to terminate the motions. (Dkt. Nos. 73, 78)

This case will proceed to trial on **Monday, January 14, 2019, at 9:30 a.m.** The parties are directed to comply with this Court's Individual Rules concerning the preparation of a pre-trial order. The joint pre-trial order, motions in limine, proposed voir dire, and requests to charge are due on **December 3, 2018**. Responsive papers, if any, are due on **December 17, 2018**.

Dated: New York, New York
September 30, 2018

SO ORDERED.

_Paul G. Gardephe_
Paul G. Gardephe
United States District Judge